```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK



----------------------------X
                            :
BENNET MARCUS, et al.,      :
                            :    11-CV-2339 (SJ)(SMG)
            Plaintiff,      :
                            :    March 18, 2013
                            :
            V.              :    Brooklyn, New York
                            :
AXA ADVISORS, LLC, et al.,  :
                            :
            Defendant.      :
----------------------------X


          TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
           BEFORE THE HONORABLE STEVEN M. GOLD
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        LLOYD AMBINDER, ESQ.
                          MICHAEL TOMPKINS, ESQ.
                          KARA MILLER, ESQ.


For the Defendant:        MICHAEL VON LOWENFELDT, ESQ.
                          ADRIAN SAWYER, ESQ.




Court Transcriber:        ARIA SERVICES, INC.
                          c/o Elizabeth Barron
                          102 Sparrow Ridge Road
                          Carmel, NY 10512
                          (845) 260-1377


Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

```
 1              THE COURT:  Civil cause for discovery and status
 2    conference, Marcus, et al. v. AXA Advisors, LLC, 11-CV-2339.
 3              For the plaintiffs?
 4              MR. AMBINDER:  Lloyd Ambinder, Virginia &
 5    Ambinder.
 6              MS. MILLER:  Kara Miller, also from Virginia &
 7    Ambinder.
 8              THE COURT:  Ms. Miller.
 9              MR. TOMPKINS:  Michael Tompkins from Leeds Brown
10    Law.
11              THE COURT:  Tompkins?
12              MR. TOMPKINS:  Yes, sir.
13              THE COURT:  Thank you.  With a "p" in there?
14              MR. TOMPKINS:  Yes.
15              MR. VON LOWENFELDT:  Good afternoon, your Honor.
16    Michael von Lowenfeldt from Kerr & Wagstaffe, for AXA.
17              MR. SAWYER:  Good afternoon, your Honor.  Adrian
18    Sawyer, also from Kerr & Wagstaffe.
19              THE COURT:  How are you?
20              MR. GERIBON:  Good afternoon, your Honor.  Michael
21    Geribon.  I'm in-house counsel for AXA.
22              THE COURT:  Tell me your last name again.
23              MR. GERIBON:  Geribon, G-e-r-i-b-o-n.
24              THE COURT:  Thank you.
25              Before I drill down into the specifics raised in
```

1    your simultaneous March 8th letters, I'd like to get a little

2    bit of lay of the land of the case again.  One of the things

3    that's confusing me a little bit is the notion that the

4    plaintiffs have been, in some of the arguments to the Court

5    as I recall them, grouping the plaintiffs into two separate

6    categories.  The defendants' letter to me groups them into

7    six.  And I'm trying to get a sense of whether those

8    distinctions into six are really meaningful for purposes of

9    the motion practice that's coming or whether it's reasonable

10   to view them into two larger categories, despite the

11   technical type of differences.

12          But having said that and creating the impression

13   that I'm familiar with the details of the case, I don't

14   remember what the two groups are or what the six groups are

15   and how they're divided.  So maybe I'll hear from the

16   plaintiff first and get a little insight into that.

17          MR. AMBINDER:  Would you like me to stand for

18   this, your Honor?

19          THE COURT:  No.

20          MR. AMBINDER:  Generally speaking, there are two

21   groups.  We call them the pre-employment and the post-

22   employment.  I believe that's what the defendants refer to

23   them as.  The pre-employments are individuals who, for the

24   most part, were not licensed and what your Honor I think can

25   refer to as unpaid interns.  They were individuals who were

1    hired, called independent contractors by the defendant, and

2    for the most part did nothing more than cold calling for the

3    company while they were studying to obtain their financial

4    sales licenses in various disciplines.

5         Once they received the license, if they made the

6    cut, they would then become post-employment, where for the

7    most part, they would work solely on commission, for the

8    most part.

9         THE COURT:  That's the second group?

10        MR. AMBINDER:  That's called the post-employment.

11        THE COURT:  Right.

12        MR. AMBINDER:  So for purposes of the motion,

13   there were these 12th editions and 20th editions and 14th

14   editions.  They were individuals who were part of what's

15   called a residential banking group, who were mostly outside

16   salespeople, for the most part.  We will not be seeking

17   certification for the outside sales group.  That won't be

18   happening.

19        We'll definitely be seeking Rule 23 New York Labor

20   Law certification for all pre-employments.  So those

21   individuals were not paid, didn't have a license, could not

22   have derived a commission from their sales.  And then we'll

23   be seeking certification at this time for the 12th edition

24   post-employment, who did obtain and receive commissions for

25   actual sales but they were not paid a minimum wage for those

1  weeks where they did not receive -- they didn't make any

2  sales or derive a commission.

3          The motion for class -- I'm not going to get ahead

4  of myself.  I know there are many subjects today.  We see

5  that as being a pretty standard, simple motion.

6          THE COURT:  The 12th edition is post-employment.

7          MR. AMBINDER:  20th.  I'm sorry, 20th.

8          THE COURT:  20th, okay.

9          MR. AMBINDER:  I used the wrong number.

10         THE COURT:  So as I recall it, there are three

11 categories in each of the pre-employment and post-

12 employment; there's 12th edition, 20th edition, and one of

13 them has an RBG which I've just --

14         MR. AMBINDER:  The 14th edition.

15         MS. MILLER:  Do you mind if I --

16         MR. AMBINDER:  Sure.

17         MS. MILLER:  I'm sorry, Judge, just to expand a

18 little bit.  So there is a 12th edition group and a 20th

19 edition group.  A 14th edition group is another group but

20 what happens is, after someone has been -- so there's the

21 pre-employment, then they become a contract position, and

22 they're either 12th or 20th.  And then after usually about

23 three years down the road, a contract is changed, so a 12th

24 edition will become 14th, a 20th edition will become a 14th.

25 So --

1          THE COURT:  But the 14^th^ group is not in our case.

2          MS. MILLER:  Correct.  It's just --

3          THE COURT:  They may be 14's now but they were --

4     only if they were 12's or 20's when -- during the class

5     period would they -- okay.

6          MS. MILLER:  Correct.

7          THE COURT:  Now, which has the RBG variation, 12

8     or 20?

9          MS. MILLER:  It's the 12^th^ edition.

10         THE COURT:  Okay.  So you're only seeking Rule 23

11    certification with respect to all of the groups pre-

12    employment and the 20^th^ edition, which doesn't have the RBG

13    variation post-employment.

14         MR. AMBINDER:  In New York.

15         THE COURT:  And you're only seeking it for New

16    York employees.

17         Second question before I give Mr. Von Lowenfeldt

18    an opportunity to explain his client's perspective on this:

19    How large is the group that got the FLSA notice, how many of

20    them responded?  My sense is that the FLSA notice went

21    nationwide.  What portion went to New York and how many

22    people in New York, if you know, fit the 4, 5, 6 but not the

23    1, 2, 3 years and thus would be getting the class notice for

24    the first time, never having gotten a 216(b) notice?

25         Did that question make sense?

1          MR. AMBINDER:  That's a compound question there.

2    Yes.

3          THE COURT:  I'm sorry.

4          MR. AMBINDER:  I'm going to have to work off of

5    rough numbers, and I have no problem if counsel want to fill

6    in the blanks with the numbers.  I'm pretty sure roughly

7    that the notice went out nationwide to about 5,000 people.

8          MR. TOMPKINS:  That's about right.

9          MR. AMBINDER:  And approximately, although some

10   are in dispute, there are 700, give and take 15 either way,

11   that have filed opt-in forms, let's call them, some of which

12   are in dispute due to potential lateness.

13         THE COURT:  Right.

14         MR. AMBINDER:  The number of New York claimants, I

15   think is 144.  Don't hold me to that.  And I couldn't begin

16   to tell you how many people worked in the three additional

17   years under New York law because I just don't know how many.

18   An educated guess:  Double the 144, probably more, because

19   these are people who opted in and the rest would be putative

20   class members.  I would imagine it's a few hundred but I'm

21   not sure what the number is for New York.

22         THE COURT:  But in -- I guess I thought the number

23   might be smaller because I assumed that -- but what I don't

24   know is whether you could be in the circumstance where you'd

25   be entitled to be a 216(b) plaintiff after spending three

```
1   years as a class rep, so that we've already captured a bunch

2   of these people with the 216(b) notice, or whether your

3   evolution from the system is short enough that by the time

4   you would be -- by the time you're -- if you qualify for

5   years 4, 5, 6 -- you're looking at me very patiently.  I

6   appreciate it.  If you qualify for years 4, 5, 6 under New

7   York Labor Law, you've already aged or employed out of the

8   group by the time you're a 216(b), so we haven't captured

9   that group.  That's what I was actually thinking about.

10              Does that question make sense, even if the answer

11  is elusive?

12              THE COURT:  I guess not.

13              MR. AMBINDER:  I apologize.

14              MR. TOMPKINS:  It makes sense to me.  I can

15  address that one.

16              MR. AMBINDER:  Go ahead, let Mike address it.

17              THE COURT:  Fine.

18              MR. TOMPKINS:  Your Honor, it does get confusing

19  with the numbers.  Let me answer that last question first.

20  Our calculations are about 5% of the New York potential

21  group have opted in.  So the 144 people represents about 5%

22  of the potential New York class.  I have not done the

23  analysis that you've asked, as to what percentage got the

24  notice versus who have never gotten the notice.  But you can

25  only be an employee agent for three years, so what you're
```

1  saying makes logical sense.  And I suspect that a large

2  number of the people in the back years either did not move

3  through the program and so dropped out entirely or converted

4  to 14th edition independent contractor status and, therefore,

5  didn't get the 216(b) notice for that reason.

6           And the 144 is not -- I haven't done the analysis

7  of the percentage.

8           MR. AMBINDER:  I could be wrong.

9           MR. TOMPKINS:  No, 144 I believe is who's opted

10  in.

11           MR. AMBINDER:  Yeah.

12           MR. TOMPKINS:  I don't know what number of people

13  in New York specifically got the FLSA notice in the first

14  place.

15           MR. AMBINDER:  We may have that back at the office

16  but I'm not sure.

17           THE COURT:  Well, I'm only -- the fine graining of

18  this is not really relevant.  What I was trying to figure

19  out is whether the timing of the class notice and the

20  significance of the class litigation was of a substantial

21  magnitude.  If the status was static, one would assume that

22  most of the putative class members would have gotten the

23  216(b) notice and the ones -- and would have had an

24  opportunity to opt in.  And whatever we decide on Rule 23

25  might be more of a technical lawyer's detail than one of

1   substantive significance.  But given the short-term status

2   in the groups we're talking about, it probably has greater

3   significance than that.

4          MR. TOMPKINS:  The putative class is substantially

5   larger than the nationwide opt-ins.

6          THE COURT:  Okay.  Thank you very much for helping

7   me reach that.  Maybe if I had asked my question more

8   directly in the beginning, I could have spared you some

9   effort.

10          MR. AMBINDER:  I think that it's for the potential

11   23 definition.  Counsel may elaborate, I guess.

12          MR. VON LOWENFELDT:  So the groups do matter; it's

13   not two groups.  Let me try to explain how the system works.

14   The actual agency program has two components:  There's the

15   employment period, which AXA internally the DSF or

16   developing sales force period, and then the 14th edition

17   agents are referred to internally as the ESF experienced

18   sales force agents.

19          So basically, you come in for three years, up to

20   three years as an employee, and you either make it and move

21   on to being an independent contractor like most of the

22   industry or you go do something else.  Before you become a

23   DSF agent, whether that's a 12th or 20th edition agent --

24          THE COURT:  Just remind me what DSF stands for.

25          MR. VON LOWENFELDT:  Sorry, employee.  Let me just

1    use the word employee.

2              THE COURT:  Okay.

3              MR. VON LOWENFELDT:  Before you become an employee

4    agent -- and there are different kinds of employee agents.

5    But before you become an employee agent, you go through what

6    AXA looks at as an extended audition period that we call the

7    pre-contract period, and that really has two phases.

8              THE COURT:  That's what they called the unpaid

9    internship period.

10             MR. VON LOWENFELDT:  That's what they call the

11   internship.  There's really two phases to that:  There's the

12   pre-contract period when you have no license.  And from our

13   perspective, you're not doing any work for AXA.  All you're

14   doing is getting your license.  You might be coming to the

15   AXA office to observe other people, so you get a sense of

16   what the job is about, but you're not performing any work

17   for AXA because you're not licensed.

18             And then once you get your license, you have to

19   sell a couple of policies before they will make you an

20   employee.  We think of it as an audition for both sides

21   because the fact is, three years is not a lot of time to

22   then be out on your own as an independent contractor, and a

23   lot of people wash out of this industry, industry-wide.  So

24   the idea of this pre-contract program is to make sure both

25   sides know what they're getting into before they go down

1    that road.

2            So there's a huge difference between pre-contract

3    before you get your license and pre-contract after you get

4    your license, in terms of what you're doing.  And then once

5    you're an employee, there's a huge difference from when you

6    were pre-contract.

7            There's another big difference:  The other big

8    difference is the RBG group, which actually I believe is

9    retirement benefits group -- it has nothing to do with

10   banking -- and the so-called traditional agents.  The RBG

11   agents' job is to work out of schools and hospitals and

12   other places where the employer pays for the retirement

13   benefits, and then they sign people up.  So they spend 90-

14   plus percent of their time outside, nowhere near an AXA

15   office.

16           It's good to hear that the plaintiffs don't want

17   to seek certification of that group.  I'm getting that for

18   the first time today.  I would note that one of their three

19   named plaintiffs is an RBG agent.  Mr. Kennedy was an RBG

20   agent, so I don't know where that leaves him or the RBG

21   agents who've opted in under FLSA, because we do have a

22   number of RBG agents who opted in --

23           THE COURT:  Well, he said he wasn't seeking

24   certification under 23.  That doesn't mean he's not seeking

25   to press their claims under FLSA.

1          MR. AMBINDER:  Precisely, because we don't -- I

2     can represent that he was a 14th edition and he was working

3     more than half of his time out of the office.  He's not

4     going to be able to be representative of the class that we

5     seek to have certified, but it doesn't negate the fact that

6     the other two can represent that potential class.

7          THE COURT:  Yeah.

8          MR. VON LOWENFELDT:  My point is, it sounds like

9     RBG is still in the case but maybe as a smaller piece.

10         THE COURT:  Well, only as an FLSA piece, not

11    relevant to the class certification motion.  In fact, I --

12    please forgive me if it sounds argumentative.  I don't mean

13    it that way.  I'm still at the learning, not deciding phase

14    here.  But the way I heard you describe this, frankly, is

15    consistent with a bifocalled analysis, in that what you're

16    saying, I think, is that all of the pre-employment, their

17    unpaid intern category, are really similarly situated for

18    Rule 23 analysis.

19         I don't mean similarly situated in that they are

20    sufficient -- share sufficient commonality to warrant

21    certification.  I mean that regardless of whether you're a

22    12 or a 20 or an RBG, you're not getting paid, you're not

23    working for us.  And whether you're inside or outside, it

24    doesn't matter, you're not an employee.

25         With respect to the post-employment category,

1  they're only looking to get one slice of that, so that two

2  out of the three post-employment categories that were the

3  subject of your letter are off the Rule 23 table.  Clearly,

4  we don't need questionnaires and depositions of two out of

5  the six groups that you identified in your letter if they're

6  not going to be the subject of the class certification

7  motion.

8         MR. VON LOWENFELDT:  I think -- a couple of things

9  about that.  As I draw the grid, if I ignore the contracts,

10  I usually draw a four-part grid, because I think RBG is

11  different pre-contract and post-contract, to some extent.  I

12  think what you're planning to do after the audition is

13  important to how you act during the audition period.  So I

14  don't see the pre-contract people as a unitary group.  I see

15  them as an RBG pre-contract and non-RBG pre-contract.

16         I would agree with your Honor that the minor

17  distinctions of the 12th and 20th edition contract are --

18  they're not irrelevant but they're less significant

19  distinctions than the RBG/non-RBG distinction.  So I have

20  always thought of this as at least four if not six

21  categories.  If they've lopped off one of the two employment

22  categories, in my mind, that leaves us with three

23  categories --

24         THE COURT:  Three, all right.

25         MR. VON LOWENFELDT:  -- not two.

1          In terms of who discovery should go to, I guess it

2    depends on what discovery is for.  If we are not going to

3    proceed towards an FLSA decertification motion at this time

4    and you are not determining what merits discovery we get on

5    the FLSA claims at this time, and they're not seeking to

6    certify a group, then I would be forced to agree that

7    discovery as to that group is not relevant.

8          It's our position that the most efficient thing to

9    do -- interestingly, I was looking, in preparation for the

10   hearing, at the cases they provided the Court.  And Exhibit

11   B, which is the Baras (ph) case -- the schedule was

12   consistent more or less with what we're saying.  They dealt

13   with FLSA decertification and Rule 23 certification at the

14   same time.  If we were to do that, then we would need, in

15   our mind, full discovery as to the FLSA group.

16         THE COURT:  Yeah.

17         MR. VON LOWENFELDT:  If we're just going to do a

18   motion on New York and kick everything else down the road,

19   then I think we're in a little bit of a different position,

20   because then we have 144 opt-ins from New York.  I don't

21   know how many of them are RBG.  I don't have that in my

22   head.  But it is certainly a -- everyone else we deal with

23   later.  I don't know that that's the most efficient thing to

24   do but there's a logic to that.

25         THE COURT:  Thank you.  I appreciate that.  It

1  helps me understand the dilemma more clearly.  I had lost

2  track of your cross-motion.

3        What do you think about whether these should be

4  litigated together or separately?

5        MR. AMBINDER:  Well, it doesn't really make a

6  difference to us whether they are "litigated" together or

7  separately, your Honor.  I think what's more important is

8  that when you're dealing with the elements of Rule 23 or New

9  York 901 --

10        THE COURT:  Could you just pull that microphone a

11  little closer to you?

12        MR. AMBINDER:  Whether you deal on parallel tracks

13  or not, I think the more substantive issue before the Court

14  right now is, should someone who files an FLSA opt-in be

15  subject to Rule 23 discovery through our named plaintiffs?

16  We will be filing our motion for class certification in the

17  next three days.  It's ready to go.

18        And we don't see the need for the defendants to be

19  able to take -- A) to delay the case, and B) to take

20  discovery from opt-ins on the issues of whether or not a

21  class can be certified and whether or not the named

22  plaintiffs can represent those of the putative class.  We

23  see there being complete distinctions between the two.  It

24  has nothing to do with the merits of their claim and it

25  doesn't go to issues of damages.

1              If this was being brought solely in New York, the

2     two named plaintiffs or three named plaintiffs would be

3     subject to discovery and a motion would be brought, and the

4     defendants of course would be subject to pre-class

5     certification discovery.  So we didn't come here expecting

6     that the FLSA opt-ins who worked in New York should be

7     subject to discovery with respect to the issue of what's

8     under Rule 23.

9              Do you see the distinction?  You don't.

10             THE COURT:  No.  I mean, I understand the words

11    you're saying, but I guess I've been under the impression

12    that the defendants wanted this discovery both to

13    demonstrate a lack of commonality sufficient to sustain the

14    216(b) certification post-discovery, but also to be able to

15    say that yeah, if the plaintiffs cherry-picked two guys out

16    of 700 New York employees in the category, they can show

17    that those two were inside and outside the same amount of

18    time, they can show that they had certain work

19    responsibilities.

20             But if we -- whether they opted into the FLSA

21    216(b) or not, we need to look at 50 or 100 of these people

22    to show you how many different scenarios subject to

23    different legal analyses there are to show that individual

24    questions predominate here and not common ones.  That's what

25    I understood the argument to be.

1           MR. VON LOWENFELDT:  That's absolutely right.  And

2    if there are 144 people who aren't just absent class members

3    but they've affirmatively chosen to participate in this

4    lawsuit, and that's only one in twenty of the potential

5    class members, we strongly feel like we should get to take

6    at least a questionnaire as to every single and of them and

7    a deposition of a large number of them exactly to deal with

8    this cherry-picking problem.  That's the putative class.

9           I must say I'm a little taken aback by this two

10   days thing, because they're the ones who proposed in January

11   that their motion be filed on May 31st.  That was their idea

12   in their letter to the Court.  We're getting along great

13   with counsel.  I don't want to make this sound personal.

14   But it's surprising to us to be accused of delay for

15   suggesting a date that they suggested.

16           If you go back a year ago, in July, there was a

17   joint -- before I got involved in the case but I can read.

18   There's a joint case management order that the parties

19   submitted, which proposed a lengthy discovery period after

20   what we're doing now, which is have the class -- if you

21   look, your Honor, at -- later I'm sure, at docket number 45,

22   which is the joint order we submitted last year, the

23   proposal was close the opt-in period, meet and confer about

24   what to do, take discovery and then have class certification

25   proceedings.  That's what we thought we were doing.  So we

1    haven't been sitting on our hands for seven months.  We've

2    been doing exactly what the order suggested.

3           There was an agreement made in January that we

4    would do the named plaintiffs' depositions by the end of

5    April, I think April 23rd or something.  So to -- I mean, you

6    can obviously file your motion whenever you want to file

7    your motion, but I'm going to want a long time to respond to

8    that motion because I haven't begun to do the discovery that

9    we need to make sure that that class motion is looked at

10   with the rigorous analysis that the law requires, involving

11   the rights of thousands of people who did not affirmatively

12   choose to participate in this lawsuit.

13          THE COURT:  Well, the only response I have to you

14   that I must say crossed my mind when I read your letter is

15   this:  Whatever the -- I assume that they will not be heard

16   to put in an affidavit from anyone that they haven't

17   provided discovery about.  And if they on their Rule 23

18   motion say, you get discovery of these two plaintiffs

19   because they're our named class reps and they're the only

20   ones whose affidavits are going in, I think you have a wide

21   open opportunity to challenge their claims about class

22   certification based upon a record that you create instead of

23   the putative class members.

24          This is not information that is uniquely in the

25   hands of the plaintiffs, I presume.  I presume the

1   defendants have people working for them who monitored,

2   oversaw, regulated this process.  If they put in affidavits

3   about what the other 850 members of the putative class, a

4   number I'm making up right now, did and why they're

5   different, and they haven't exposed their putative class

6   members to discovery, I suppose that's the record that the

7   Court will have before it when it decides the motion.  Why

8   isn't that not advantageous to you rather than hurtful?

9            MR. VON LOWENFELDT:  It might be.  You know, this

10  is the chess versus poker dilemma; do I want perfect

11  information or imperfect information?

12           THE COURT:  Yeah.

13           MR. VON LOWENFELDT:  It may be that that ends up

14  being advantageous to me if you deny the relief that we seek

15  and they move in three days with just a handful of people.

16  Certainly, I would still need months to get ready but that

17  would make some sense.

18           On the other hand, it may be that there's very

19  good -- the person who's going to know best what each agent

20  did is that agent.  So there will be some knowledge from

21  managers about what the people were doing, and I'm sure we

22  will have those declarations.  But fundamentally, only an

23  agent knows what the agent is doing on a day-to-day basis in

24  their home.  That's our whole case here is that these are

25  not supervised people; each one of them is going to be

1    acting differently.

2         I think that, although I would hope to persuade

3    the Court with manager declarations, that I could do a more

4    persuasive job if I had a set of comprehensive discovery

5    responses written in a non-argumentative, non-overly-

6    lawyered way, so we got actual human being responses, not a

7    big pile of junk that we can't use, that were quantifiable

8    and could be subject to analysis.

9         What we did when we drafted the questionnaire is

10   we tried to think about, what are the relevant questions in

11   the case and how would I ask that question if I was just

12   sitting in a coffee shop asking someone in a form -- you

13   know, when you go to the doctor and they ask you, do you

14   have this, do you have that, and you have these long kind of

15   check-off forms.

16        That was the model we were thinking through, with

17   the idea being that the burden for any individuals is

18   insignificant, and we're going to get good data, real data

19   from them.  Obviously, we'll also have managers, that's

20   right.  But I think I'm allowed to have a little bit more

21   information than just the managers.

22        The other problem is, with truly absent class

23   members, we're in a little bit of a gray area, but I think I

24   can still contact them.  The law, as you know, is always

25   moving on that point.  I can't contact the FLSA opt-ins;

1  they're clearly their clients.

2          THE COURT:  I'm glad you said that because you may

3  know I had a case where that's exactly what happened.

4          MR. VON LOWENFELDT:  I didn't know that but it's -

5  - but no --

6          THE COURT:  But I understand that you're aware.

7          MR. VON LOWENFELDT:  So being aware of that, it

8  necessarily limits us to some extent.

9          THE COURT:  Right.

10          MR. VON LOWENFELDT:  I will note that at the FLSA

11  stage, they introduced evidence by declaration from people

12  other than the named plaintiffs.  I would assume that the

13  same thing will happen again, and I don't know what will

14  happen in conjunction with the reply brief.

15          If this Court were to say they're not allowed to

16  present any evidence that wasn't in their opening briefs and

17  we can go and do whatever we can and give us a bunch of time

18  to do that, I could probably make that happen without

19  talking to the opt-ins.  But that's not to say that I don't

20  think the opt-ins are relevant people who should be -- have

21  some discovery taken from them.  And I don't think what

22  we're proposing is in any way burdensome vis à vis any

23  specific person.

24          THE COURT:  Hold your fire for one more question,

25  if you will.  What is the legal defense -- I guess I don't

1    really understand what the legal defense to the -- I

2    understand the outside salesperson exemption for people who

3    can earn commissions.  I say I understand it.  I know enough

4    about it to have this discussion.  I don't understand what

5    the audition defense depends on.

6         MR. VON LOWENFELDT:  In the pre-license period,

7    which is the bulk of the audition time, when they're

8    studying for their license, they're not doing any work.  The

9    idea that they're cold calling is just not true.  If someone

10   was cold calling in the one branch where they have

11   witnesses, then we have a one-branch problem, but it's not a

12   program where they're supposed to be cold calling.  They're

13   not licensed, they can't sell.  So our position is, most of

14   those people, what they're doing does not constitute work.

15        THE COURT:  What is your position as to what they

16   are doing?  In other words, if it's not work, what is it?

17        MR. VON LOWENFELDT:  So to get your licenses, you

18   have to be affiliated with a company.  So they're basically

19   borrowing AXA's name in order to take the tests and get the

20   licenses while they figure out whether they want to sign on

21   with us and we figure out whether we want to sign on with

22   them.  That's basically what they're doing.

23        THE COURT:  They have no -- your point is, they

24   don't have to show up --

25        MR. VON LOWENFELDT:  They can have other jobs.

1   They have no exclusivity.  They don't owe any obligations to

2   us.  They can stop any time they want.  We're not paying for

3   anything for them.  It's an affiliation that's aimed towards

4   reaching an employment relationship but it is not --

5         So technically -- the technical argument is that

6   they're independent contractors, because we don't control

7   the means and manner by which they do basically anything.

8   The only controls about anything are legal controls that

9   relate to compliance, things like they can't sell without a

10  license.

11        Then you have this tiny sliver of time after they

12  get their license where they're acting as independent

13  contractor salespeople, to show that they can sell.  There,

14  the means and manner is not being controlled.  Again, they

15  don't have schedules.

16        Now, as I said, they may want to come in and show

17  what I refer to as an under-performing subclass or a manager

18  who was twisting down too much on these people.  That's not

19  going to speak to the state as a whole, that's not going to

20  speak to thousands of people.

21        The program as designed is not designed to

22  generate work for AXA from the pre-contract people until

23  they get their license.  And after that, it's a very short

24  independent contractor period, where just like the rest of

25  the industry uses independent contractors, we don't control

1    their means and manner, we don't control their timing, and

2    they just -- they can do that in a day or several months.

3    There's a time limit because at some4 point, you run out of

4    program.

5              THE COURT:  What's the educational requirement to

6    even become an auditioner?

7              MR. VON LOWENFELDT:  They're --

8              THE COURT:  Are they all college graduates?

9              MR. AMBINDER:  Most of them are -- what makes it

10   particular bad is that -- your Honor doesn't recall perhaps

11   the oral argument on the 216(b), but all of this was brought

12   up.  And the point is that (ui) couldn't close the deal.

13   They had to call (ui) salesperson to do that.  But they were

14   required to be in the office at 8:00 and they were required

15   to work on Saturdays.  These are facts --

16             THE COURT:  Right.

17             MR. AMBINDER:  -- the issue of the case.  The

18   whole thing of, we were just doing you a favor is just not

19   true.  Workers have told us they had to buy the proprietary

20   Dell laptop, they had to buy the proprietary software to

21   learn.  It wasn't just about getting a license.

22             But I don't want to get into the facts because now

23   we're going to start arguing merits of the case.  Suffice to

24   say, your Honor -- and I have the transcript -- throughout

25   the oral argument kept asking defendants' prior counsel,

1   they worked for you and you didn't pay them.  And we didn't

2   call them interns.  You called them interns, actually, in

3   the transcript.  They were just unpaid employees and that's

4   all this really comes down to.

5           THE COURT:  Right.  Well, I don't want to deal

6   with the merits but now I have a better sense of the factual

7   dispute.  The reason I'm asking about the education level is

8   because I looked at that questionnaire and it's challenging

9   for someone to kind of get their arms around it.  But if

10  these are college graduates on their way to getting

11  broker/dealer licenses --

12          MR. AMBINDER:  That's what we're talking about,

13  Judge.  Look, respectfully --

14          THE COURT:  I never feel anything but respect

15  toward or from you, Mr. Ambinder, I assure you.

16          MR. AMBINDER:  At the end of the day, I'm not sure

17  where the Court is going with this.  If you said to me,

18  look, Mr. Ambinder, if you want to put in some (ui)

19  declarations or affidavits from putative class members who

20  are affected under New York law prior to the three year

21  look-back and if you do that, they're going to be subject to

22  discovery, I hear you on that.  That is not an uncommon

23  directive by a court on a motion for class certification.

24          But if the Court is going in the direction of an

25  FLSA opt-in has to now fill out a nine-page, 130-question

1   questionnaire as part of the Rule 23 motion for class

2   certification --

3          THE COURT:  No, no, the question is whether the

4   decert -- that's why I think the first question we have to

5   answer is whether we're untangling the Rule 23 in the

6   decertification cross-motion or whether we're keeping them

7   as one set of motion papers.

8          MR. VON LOWENFELDT:  Your Honor, we do think --

9   I'm sorry, Mr. Ambinder.  We do believe that on the Rule 23

10  motion, the people who by coincidence are opt-ins -- I

11  understand I can't send an interrogatory to an absent class

12  member, but an opt-in is a party in the case.  They're not

13  excluded from the New York class.

14         THE COURT:  I get that.  I mean, you're entitled

15  to some discovery in aid of your motion, but I don't think

16  it's coincident with the -- I don't think that there's a

17  rigid principle that says when you're going to have

18  certification motion practice under Rule 23, that every

19  216(b) opt-in is subjecting themselves as a result to

20  discovery on the Rule 23 motion.

21         You're making the argument that that's a useful

22  group to take discovery from.  Mr. Ambinder says no.  We can

23  debate that.  But I certainly don't subscribe to the idea

24  that there's a per se rule that once you file a 216(b) opt-

25  in, then you become the subject of interrogatories and

1    depositions in the Rule 23 class certification motion.

2         What I am more concerned about is this decision --

3    the scope of discovery on the decertification motion,

4    though, is more coincident with the scope of the opt-ins,

5    even if we do sampling.  Then there's a real tie-in between

6    the fact that you opted in and the fact that there's a

7    decert motion.  That's different from the fact that because

8    you opted in, you happen to be available for Rule 23

9    discovery.

10        MR. AMBINDER:  I hear you.  In New York -- I don't

11   know from California.  I just know New York just dealt with

12   this recently on a case (ui).

13        THE COURT:  Okay.

14        MR. AMBINDER:  The standard for decertification

15   for an FLSA is different than the standard for certification

16   under 23.  They're completely different standards.  That's

17   issue one.  We believe that the 23 should just go forward.

18   We should move the case along and not wait until the end of

19   the year to start first getting involved in the decert

20   motion and the cert motion.   We would just prefer to move

21   along quickly with the 23.

22        I would understand if you said, if you couldn't

23   get me supporting affidavits, expect to produce them for a

24   deposition.  Okay, I think that's fair.  I mean, they should

25   have a right to do that.  But right now, they were jumping

1    in too many places at once, and I don't think we should.

2          With respect to the -- if you want to jump over

3    now to the actual questionnaire itself --

4          THE COURT:  We'll get there.

5          MR. AMBINDER:  All right, then we'll stay away

6    from that, but that's where I would like --

7          THE COURT:  Just because we've got a lot -- I

8    agree with you, maybe I put too many balls in the air at the

9    same time.

10          MR. AMBINDER:  I would agree then --

11          THE COURT:  It's your -- it's plaintiffs' case.

12   I'm a little concerned about the two motions coming together

13   for a reason I haven't articulated, which is that given that

14   this is not a consent case, my understanding is that the

15   question of 216(b) is appropriately decided by a magistrate

16   judge, but the question of Rule 23 is not.  So unless you're

17   going to consent to have the magistrate judge decide the

18   Rule 23 issues, you could end up with pieces of the case in

19   front of two different judges.

20          I also think that, you know, we at least

21   theoretically toll the Rule 23 claims while the putative

22   complaint is pending, on the theory that these people might

23   otherwise file timely claims.  They're counting on the Rule

24   23 case and seeing how it develops.  If there comes a time

25   when they lose their Rule 23 motion, those plaintiffs are

1    entitled to pursue their individual actions while people

2    still remember and have records that relate to them.  So I'm

3    eager to get the Rule 23 practice, too.  So those are good

4    reasons to delink it from the decert motion, I think.  Okay.

5    And maybe the Rule 23 practice will inform us.

6           So let's go through these discovery -- and also,

7    the Supreme Court has recently -- I can't remember the case,

8    now that I've opened my mouth, but they've -- I guess it was

9    the materiality case in the securities fraud context talked

10   about the importance of moving Rule 23 practice as forward

11   as possible and not getting bogged down in the merits of the

12   legal case while you do it.

13          MR. VON LOWENFELDT:  We'll see what they tell us

14   in Comcast and whether it's consistent with the materiality

15   case that seems to be a lot of this lately.

16          THE COURT:  Well, you get that from the entire

17   bench, don't you?

18          So let's go through these letters and see what we

19   can decide now about going forward, in light of this

20   decision to untangle the Rule 23 and the FLSA decert.  I'm

21   going to put the two letters in front of me and maybe we can

22   talk about them one at a time.  I'm sorry if I made us a

23   little bit later in the afternoon, in light of the fact that

24   I have all this background.

25          I continue to feel that this questionnaire -- my

1  take on the questionnaire is that it's asking the same

2  questions in two different ways.  There are some narrative

3  questions that say, what did you do, where did you do it and

4  how long did you spend, and then there's, fill out this

5  grid.

6           And I understand that you've like to have some

7  kind of mathematician come in and break out the hours, but I

8  think that you're really asking the plaintiffs to do your

9  job of ferreting out the inferences from the facts that

10  they're articulating.  In fact, at the bottom of page 4 of

11  your letter -- I'm addressing myself without saying so to

12  Mr. Von Lowenfeldt, whose name I just pronounced, right,

13  Lowenfeldt?

14           MR. VON LOWENFELDT:  Von Lowenfeldt, yes, your

15  Honor.

16           THE COURT:  Von Lowenfeldt.  You said, all we're

17  really asking, Judge, you tell me in the bottom paragraph of

18  page 4, is tell us each activity you performed, where you

19  performed it and how long it took.

20           And my inclination, given the nature of the folks

21  we're talking to, some of whom may have kind of an

22  engineering/mathematical bent and some of whom may not --

23  you probably have English majors and physics majors who want

24  that Wall Street money -- my instinct is to give them the

25  option of either filling out the grid or filling out the

1   written responses, because they seem redundant to me.  What

2   am I missing there?

3          MR. VON LOWENFELDT:  Some of the written questions

4   do not ask what they did; it asks what instructions they

5   were given.

6          THE COURT:  Okay.

7          MR. VON LOWENFELDT:  What instructions you were

8   given is not the same thing at all with --

9          THE COURT:  Fair enough.

10          MR. VON LOWENFELDT:  So question 1 and 2 and 3 are

11  clearly not duplicative of the grid at all.  I can see your

12  argument on question 4.  I was trying to be a little more

13  subtle, inside/outside the office, to get more

14  particularized statements (ui) whatever.  We don't need

15  that, I guess.

16          With question 5, how often did you come to the

17  office, if they tell me they were in the office four hours a

18  day, I don't know if that's four times or one time a week.

19  So I don't think that's a duplicative question, I think

20  that's a separate question.

21          THE COURT:  I'm sorry, how many -- how many times

22  a week did you come to the office?

23          MR. VON LOWENFELDT:  Right.  I can see the

24  argument on 6, although there's not a grid question for

25  calls but we could add one.

1          THE COURT:  No, I don't want to do that.

2          MR. VON LOWENFELDT:  But there's no grid question

3  on calls, so then how is 6 duplicative because there's no

4  question about calls.

5          THE COURT:  You're right.

6          MR. VON LOWENFELDT:  And I could go through this

7  but I did -- we did attempt to ask different questions.

8  What we're not trying to do is trap people with inconsistent

9  answers.  What we're trying to do is take the major

10  activities that people did perform in terms of categories

11  and present them in a grid so they can work their week

12  together, and then ask questions to fill in the gaps that we

13  had suspected that process would result in.

14          And certainly I'm happy to discuss with

15  plaintiffs' counsel or -- I don't know that we have to take

16  up the Court's time erasing some of these questions or

17  rewording them to eliminate duplication, but that was the

18  goal.  And the goal of the grids is to ask what they're

19  doing and split it up between the various places that we

20  think are important in time:  Before your license, after

21  your license, when you were an employee, which we would

22  expect different activities in the different time periods.

23          THE COURT:  First of all, there is a cold calling

24  entry on the grid.

25          MR. VON LOWENFELDT:  Not in the pre-contract

1    period.   Question 6 is directed to the pre-license/pre-

2    contract period.

3               THE COURT:  Okay.

4               MR. VON LOWENFELDT:  And there is --

5               THE COURT:  So on chart B --

6               MR. VON LOWENFELDT:  Chart B is the post-license.

7               THE COURT:  And chart C is post-license.

8               MR. VON LOWENFELDT:  Chart C is the employee

9    period, yes, your Honor.

10              THE COURT:  Okay.

11              MR. VON LOWENFELDT:  That's why.  And if you'll

12   note, actually, when we look at the post-licensing

13   questions, which are 14 through 22, there's not a cold

14   calling question there because it's on the chart.  So we

15   were trying very carefully -- and I do not pretend to be

16   perfect.  There may be duplication here, but we were trying

17   to avoid duplication.

18              THE COURT:  Would this be simpler if instead of

19   having to check the box, you could fill in the number of

20   hours?  I don't know why but this -- is it the Y axis with

21   these different ranges?  It's confusing to me.

22              MR. VON LOWENFELDT:  What I would suggest, your

23   Honor, rather than spend the next twenty minutes discussing

24   those kind of things -- if your Honor agrees with us that a

25   questionnaire of some sense is appropriate and that we're

1  not asking hundreds of questions here --

2          THE COURT:  I'm not worried about the number of

3  questions.

4          MR. VON LOWENFELDT:  -- I think that plaintiffs'

5  counsel and we could work out formatting questions and

6  what's easiest to fill out and what makes the most sense --

7          THE COURT:  Okay, good.

8          MR. VON LOWENFELDT:  -- to gather the type of

9  information we're seeking here.  We have not yet attempted

10  that because there's a gulf between the parties on whether

11  this level of detail is appropriate in the first place.  But

12  if you agree that it's appropriate but the format is not the

13  best, I am sure that it's better for us to try and work it

14  out.

15          THE COURT:  Okay.

16          Mr. Ambinder, do you want to get another word in

17  before I decide?

18          MR. AMBINDER:  I'm going to give you a quick word.

19  At the end of the day or at the beginning, we were not

20  averse to the issue of using a questionnaire.  We were

21  willing to use one.  It's just that we think this is way too

22  dense.  Our letter speaks for itself.  I'm more than happy

23  to meet and confer to come up with something.  My fear is

24  that it's the substance of the questionnaire -- if you ask

25  questions that you only want to get answers to and you fail

1    to put in other --

2          THE COURT:  You can add some questions if you

3    like.

4          MR. AMBINDER:  Of course.  So we're prepared to

5    meet and confer.

6          THE COURT:  Yeah.  I mean, the graphic spread --

7    what I don't want to have happen -- here's the fear that

8    crossed my mind.  I'm not trying to be indirect.  Sometimes

9    you just get into the trees and you forget the forest.  What

10   I don't want to have happen is somebody get one of these,

11   their eyes glaze over, they don't put it in, and you say

12   dismiss their FLSA claim for failure to cooperate in

13   discovery.  That's the fear, and this is an overwhelming

14   looking questionnaire, even if substantively, it's not that

15   overwhelming.

16         MR. VON LOWENFELDT:  I think, your Honor, if we

17   remove the graphic and do it differently, the questionnaire

18   gets a little longer because it takes more space to ask the

19   question in a different format.  The graphic was actually --

20   our intention was to shrink the size of the document --

21         THE COURT:  Yeah.

22         MR. VON LOWENFELDT:  -- in terms of number of

23   pages.  But if that is not as much of a concern, I am

24   positive that the creative minds on both sides --

25         THE COURT:  Okay.

1          MR. VON LOWENFELDT:  -- can work out a way to ask

2     these type -- this level of detail questions without

3     confusing or overwhelming anybody.  We certainly are not

4     attempting to -- it doesn't do me any good on the

5     decertification motion if I come in and say, well, we sent

6     this to 144 people in New York, your Honor, and none of them

7     filled it out, so dismiss them.  Now I don't have any of the

8     evidence I was trying to use to argue either decert with

9     respect to everybody else or --

10          THE COURT:  Or in opposition to 23.

11          MR. VON LOWENFELDT:  Correct.

12          THE COURT:  Okay.  Well, I will give you a chance

13     to redo the questionnaire.  I'm not concerned about the

14     number of questions in a case of this complexity and

15     magnitude.  I'm just not, nor do I think that this is

16     overbearing.  I do think that the physical layout is a

17     little intimidating and I don't want anybody chilled from

18     filling it out because it looks so hard to complete.  You

19     know, it reminds you of those class action notices you get

20     on tissue paper that are fifty pages long and very fine

21     print.  Nobody wants to sit down and deal with it.

22          MR. AMBINDER:  Let's see what we can do.

23          THE COURT:  So now let's talk about numbers, okay?

24     We've got a class of New York plaintiffs that fall into, at

25     most, three categories, right?

1          MR. VON LOWENFELDT:  Right.

2          THE COURT:  We don't need a huge universe to draw

3    inferences, assuming -- what I don't want to have happen,

4    Mr. Ambinder, is we whittle down the number that the

5    plaintiff gets to take -- excuse me.  We whittle down the

6    number that respond and then you make an argument that

7    that's not statistically significant or lacks relevance

8    because the number is so small.  You can't have it both

9    ways, obviously.

10          MR. AMBINDER:  The way I'd like to have is the way

11    that I would tell the Court is we think is typically the way

12    it's done.  We engage in pre-cert discovery on paper and

13    then the class representatives bring a motion.  That's how

14    it's typically done.  We're expanding this now into

15    something that we respectfully submit shouldn't be.  There

16    shouldn't be an opportunity to reach out to perhaps over a

17    hundred people to get involved in issues of commonality/

18    typicality.

19          Your Honor may not recall.  This type of case

20    already settled as a class action in California.

21          THE COURT:  I do recall.

22          MR. AMBINDER:  The court in California found all

23    the elements of certification existed on a class that I

24    think was far more expansive than what we're going to be

25    moving for.  So we just do not understand, and your Honor

1    will rule as you see fit, why the defendants should be

2    permitted to take discovery against what I would call for

3    the purposes of the 23 motion on the issues of 23 only,

4    discovery from putative class members essentially.  And the

5    FLSA opt-ins are FLSA opt-ins.  They're not taking discovery

6    against someone who worked five and a half years ago.

7    There's not going to be any of that.

8              So I don't understand why they're taking

9    discovery, unless of course we put in a supporting

10   declaration.  That's different.  Then we have to produce

11   them to respond to discovery.  But we don't understand why

12   they should be given the opportunity to take discovery from

13   FLSA opt-ins who work in New York.

14             THE COURT:  In the typical class certification

15   motion, there is no FLSA precursor.

16             MR. VON LOWENFELDT:  We would then do it by

17   deposition.  We would seek permission --

18             THE COURT:  Of the named plaintiffs.  Are you

19   going go out and start identifying putatives and proposing

20   them at random?

21             MR. VON LOWENFELDT:  The rules do allow us to ask

22   for that.  And I have to say, in the pre-Walmart world,

23   there was a big distinction between merits discovery and

24   class certification discovery.  In the post-Walmart world,

25   that's not clear any longer.  So we don't see the big

1    distinction we're talking about.

2            I would also point out that to the extent we ask

3    anyone discovery at this time, we don't get to ask the same

4    discovery of the same person again later.  So with respect

5    to that person, what difference does it make to them whether

6    they get deposed or they get a questionnaire --

7            THE COURT:  You're assuming you're going to lose

8    your motion.

9            MR. VON LOWENFELDT:  No, I'm not assuming I'm

10   going to lose my motion, not at all.  What I'm saying is,

11   the possibility of having the deposition -- you're right, it

12   would actually benefit everybody if we just had the motion

13   and won and then --

14           THE COURT:  Here's my proposal:  We have three

15   groups.  We don't have as huge a population as I thought.  I

16   think we pick 60 and send them the questionnaires.  You get

17   the questionnaire results and you decide if you need

18   depositions or not after you get --

19           MR. VON LOWENFELDT:  60 from New York.

20           MR. AMBINDER:  60 from New York.

21           THE COURT:  60 from New York to get these

22   questionnaires.

23           MR. AMBINDER:  Why not nationwide?

24           THE COURT:  I'm sorry, what?  Why not nationwide?

25           MR. AMBINDER:  I thought the discovery we were

1    talking about in these letters was nationwide discovery --

2              THE COURT:  But you just said we should untangle

3    the --

4              MR. AMBINDER:  I'm not stopping the defendants

5    from taking nationwide discovery.  We just propose that it

6    should be limited to 60 people.  That's all we've ever said.

7    We never, never dreamed it was going to be 60 people from

8    New York.  How does that have anything to do with their

9    potential motion to decertify nationwide?  Their whole

10   letter talks about nationwide issues.

11             THE COURT:  We're talking about Rule 23 class

12   certification now.

13             MR. AMBINDER:  We never offered 60 from New York

14   for certification.

15             THE COURT:  I'm not saying what you offered.  They

16   want to send this to everybody, right?

17             MR. AMBINDER:  Around the country.

18             THE COURT:  Yes, everybody.

19             MR. AMBINDER:  Yes.

20             THE COURT:  I'm saying they shouldn't send it to

21   everybody in connection with class certification.  I think

22   if they got a population of 60, it would be more than

23   adequate to demonstrate the lack of commonality.  How are

24   they hurt -- how are you hurt if those 60 have to fill it

25   out now and it's in the bank for the decert motion?

1          MR. AMBINDER:  They're all from New York.

2          THE COURT:  Yeah.  And they depose your named

3    plaintiffs and who you put in declarations from, or if they

4    get these back and they're so ambiguous, we deal with an

5    application for depositions beyond the scope of what you're

6    proposing at that point.

7          MR. AMBINDER:  So then I take it then that if

8    we're getting discovery -- if we're producing discovery for

9    60 of these opt-ins, we will get, and we haven't addressed

10   it yet, discovery from the defendants, all the discovery

11   from the custodians that we seek in our letter, that they're

12   prepared --

13         THE COURT:  For those 60.

14         MR. AMBINDER:  For those 60.  Well, if your Honor

15   has ruled it's 60, we have to deal with 60.

16         THE COURT:  Well, I think with three groups, at

17   least 20 per group makes sense, to get a sense of whether

18   there's so much variety in their particular circumstances

19   that it's inappropriate to certify a class, or whether

20   there's such commonality.  Look, it may be that these come

21   back in a way that really helps you.

22         MR. AMBINDER:  Your Honor, I have issues with your

23   Honor's ruling, especially since many of these people worked

24   for periods of time when they were desperate for an initial

25   job.  It may not have lasted very long.  They may have de

1  minimis claims, and it's hard to say that someone is going

2  to sit down for an hour and fill this out, who may have a

3  claim --

4          THE COURT:  But they've opted in.

5          MR. AMBINDER:  But they're not -- but they might

6  want to avail themselves of the Rule 23 as well.  We're

7  taking discovery from opt-ins on a Rule 23 motion for those

8  who haven't opted in, who may have worked five years ago,

9  when things were different for all I know.

10         THE COURT:  Well, we're going to have to agree

11 that any differences are not going to be the subject of the

12 motion practice, right?  In other words, if you're going to

13 target these -- this group for questionnaires to try to

14 establish a degree of variety, don't come back and tell me

15 the questionnaires are irrelevant now that they all look the

16 same.

17         MR. VON LOWENFELDT:  We wouldn't say they're

18 irrelevant, your Honor.  I do think that your Honor was

19 correct initially that there will be manager testimony as

20 well and other observational testimony.  I mean, this isn't

21 a random sample of the New York agents.  It's not

22 statistically significant, even if we do all 144, because

23 these are people who have self-selected for the lawsuit.

24         THE COURT:  Sure.

25         MR. VON LOWENFELDT:  So just by that act, we're

1    not getting a statistical sample of New York.  So we may

2    have -- we may have other evidence that speaks to --

3              THE COURT:  Other evidence or evidence that

4    discounts the relevance of this because it's from the wrong

5    time period.

6              MR. VON LOWENFELDT:  Right, correct.

7              THE COURT:  Yes?

8              MR. VON LOWENFELDT:  Yes.

9              THE COURT:  Well then, why should I put these 60

10   people through it, if it's not from the right time period?

11             MR. VON LOWENFELDT:  Well, it's not that it's not

12   from the right time period, it's not from the entire time

13   period.  It is from the right time period, it's just from

14   the most recent --

15             THE COURT:  Well, did the practices change?  Are

16   you going to put in management affidavits that there were

17   different practices during years 4, 5, 6?  If you're going

18   to do that, I'm not going to put these 60 people through

19   this.

20             MR. VON LOWENFELDT:  I am not presently aware of

21   any corporate practices that changed in those years.

22             THE COURT:  All right.

23             MR. VON LOWENFELDT:  I do not leave out the

24   possibility that there was a rogue manager in one branch who

25   was acting badly for a certain period of time.

1          THE COURT:  We're not talking about that.

2          MR. VON LOWENFELDT:  Okay.  No, there are no

3    corporate practice differences that would be relevant.

4          THE COURT:  And you'll so stipulate before the

5    questionnaires go out.

6          MR. VON LOWENFELDT:  Well, we've given them the

7    practices for the entire time period, and they're the same.

8          THE COURT:  So you'll stipulate -- then it's an

9    easy stipulation.

10          MR. VON LOWENFELDT:  Yes.  I want to confirm with

11    the client to make sure I'm being accurate.

12          THE COURT:  Sure, sure.

13          MR. VON LOWENFELDT:  But yes.

14          THE COURT:  Sure, that these responses would be

15    just as -- would be no more or less informative if they were

16    from a group of people who were in the class period rather

17    than subsequent to it.

18          MR. VON LOWENFELDT:  If I send out the

19    questionnaire and you give me 60 New York people and I don't

20    like the answers, I'm not going to argue they can't use it.

21          THE COURT:  That's not my point.

22          MR. VON LOWENFELDT:  Okay.

23          THE COURT:  But I don't want you to argue against

24    it after you sought it --

25          MR. VON LOWENFELDT:  Right.

1          THE COURT:  -- by saying, they're really not that

2    helpful to the analysis because our practices during years

3    4, 5 and 6 were different than our practices during years 1,

4    2, 3.

5          MR. VON LOWENFELDT:  Okay.  I'm not aware of any

6    such argument.

7          THE COURT:  Okay.

8          MR. VON LOWENFELDT:  But I'll confirm that.

9          THE COURT:  So before you send the questionnaires

10   out, you can confirm that and stipulate that they would be

11   just as probative as if they came from the proposed class

12   period.  And then we'll have a data -- an empirical basis

13   upon which to try to resolve this factual dispute.

14         MR. AMBINDER:  If I can just seek clarification

15   and ask for -- so this means now we're going to get full-

16   blown discovery for all the number, whatever it's going to

17   be, plus we're going to take the depositions of all these

18   managers, which we'll do -- we're prepared to do all that.

19   Can I throw just a tiny bit of a wrinkle in this?  Can we

20   make it 20 and 20 (ui).

21         THE COURT:  I don't know what you mean by 20 and

22   20.

23         MR. AMBINDER:  Because whether you're 12th or

24   you're 20th, you didn't get paid.  You didn't have a license

25   and it's their -- it's defendants' position that you didn't

1  even work, you were there just to get your license.  Can we

2  make it 20 pre-employment and 20 post-employment?

3  　　　　　MR. VON LOWENFELDT:  That doesn't add up to 60 but

4  I would be happy to split the 60 between the two groups.  I

5  think that's logical.  I would note, though, that everybody

6  who's in the second group was at one time in the first

7  group.  So it's not as though --

8  　　　　　THE COURT:  Well, that's a good point for the 20

9  and 20, isn't it, because you're going to be getting double

10  data from half of them.

11  　　　　　MR. VON LOWENFELDT:  Well, we'll get data from

12  agents who completed it successfully and moved on and agents

13  who --

14  　　　　　THE COURT:  But my point is that some people will

15  qualify in both groups.  Everybody is going to -- everybody

16  in the second -- in the post-employment group will qualify

17  to both, and your questionnaire asks them about their first

18  experience as well as their second.

19  　　　　　MR. VON LOWENFELDT:  That's correct.

20  　　　　　THE COURT:  So he's right that 40 should be enough

21  because you'll in essence be getting -- even if half are

22  post-employment, if 20 are post-employment, you'll be

23  getting 40 plus 20 in terms of information.

24  　　　　　MR. VON LOWENFELDT:  I'll be getting on the 40

25  pre-employment but I'll only be getting 20 on the post-

1    employment, and there are eight New York offices.  So maybe

2    I'll get lucky --

3           THE COURT:  I was envisioning 20/20 in the two

4    different pre-employment groups and 20 in the post-

5    employment.  Now I'm realizing that --

6           MR. VON LOWENFELDT:  He's asking for 40.

7           THE COURT:  Yes, that if we give you 40, you'll be

8    getting the equivalent of 20/20/20, because half of those 40

9    are going to be able to answer two sets of questions.  So 40

10   it is.

11          Now, are we going to pick them randomly or -- you

12   each want to pick some of them.  So with 40, you could each

13   pick 10 and pick 20 at random or you could pick 40 at

14   random.

15          MR. VON LOWENFELDT:  Well, they have access to

16   people who they're going to submit declarations from, so why

17   should they get to pick any of them?

18          THE COURT:  Well, we've already said anybody who

19   submits a declaration --

20          MR. VON LOWENFELDT:  No, but what --

21          THE COURT:  -- has to --

22          MR. VON LOWENFELDT:  Right, but what I'm saying

23   is, they get to make that pick initially.  Why shouldn't I

24   get to pick all 40?

25          MR. AMBINDER:  Wait --

1          MR. VON LOWENFELDT:  If it's 40.

2          MR. AMBINDER:  We see it just the opposite.

3    They're our clients and it's a motion for certification.  I

4    don't know why we shouldn't be able to pick all 40.  They're

5    our clients.  As I said, normally, I would aggressively --

6          THE COURT:  Random.

7          MR. AMBINDER:  All of them?

8          THE COURT:  Yeah.  If you can't agree, we'll do it

9    random.  If you work out an agreement, that's fine, too.

10          MS. MILLER:  What about 10, 10 and 20 random, or

11    something like that?

12          MR. VON LOWENFELDT:  The problem I have with

13    random is there are eight offices and I want to make sure we

14    capture all the offices.  They're not equal in size.

15          THE COURT:  You have a manager available from each

16    office, too, right?  If you want to do 10, 10 and 20, I have

17    no problem, but I'm not giving one side the ability to

18    control it because then we don't accomplish the result.

19    Because if you pick them, Mr. Ambinder, he's going to say,

20    of course, they're all common, he screened 100 to come up

21    with these 40.

22          MR. AMBINDER:  Let's say of the 40, we only get 29

23    in.  This Court decides it's not going to certify our class,

24    which will affect people who worked five years ago, who

25    weren't even subject to discovery.  I'm just not following

1   why you --

2          THE COURT:  Why am I doing it?  Because you've got

3   a factual dispute that drives the outcome of the motion, and

4   I don't want the Court to be left with two affidavits from

5   the plaintiff and five affidavits from the defendant and no

6   way to resolve the factual dispute, and then to first have

7   discovery on the questions of fact that are raised by the

8   class certification motion thereafter.

9          I'm trying to create a basis of empirical data

10  that has some element of randomness, so that a court can

11  rely upon it to say, this data was manipulated by either

12  data.  This data tells me either that these people never

13  went into the office or one spent 60 hours in the office,

14  one spent 30 hours in the office, one never went to the

15  office.  We've got people in each group.  They're too

16  different or everybody is telling me the same story.  That's

17  why.  Otherwise, how does a court decide this motion?

18          MR. AMBINDER:  The same way they decide most 23

19  motions.

20          THE COURT:  Most 23 motions don't involve disputes

21  of fact about what the employees did.  They involve

22  arguments about whether or not the minor details that

23  everybody acknowledges are sufficient to overcome the

24  commonality and typicality problems, I think.

25          MR. AMBINDER:  Well, I'm (ui).

1           THE COURT:  Okay.

2           MS. MILLER:  Your Honor, if it's okay, the

3   10/10/20, I think.

4           MR. VON LOWENFELDT:  We'll agree to each pick 10

5   and have 20 random.

6           THE COURT:  Great.  Let's move on.  We'll have --

7   maybe we should be on a panel together someday and we'll

8   have a philosophical debate.

9           All right.  So we talked about the scope of the

10  questionnaire, we talked about who's going to answer it.

11  The deponents will be those who the plaintiffs are going to

12  put in declarations for.  And of course, the named

13  representatives, and of course, anybody that the defendants

14  are going to be put in.  Named representatives -- the

15  defendants can come back if the questionnaires are filled

16  out with, you know, pictures of trees and houses instead of

17  answers and say, Judge, we can't -- I'm being a little

18  facetious now but --

19          MR. VON LOWENFELDT:  What I would suggest, your

20  Honor, is that there may be other -- we may get, for

21  example, a questionnaire that's a real outlier questionnaire

22  that we want to ask that person how is it that they could be

23  doing what they say, and we might want to come in and ask

24  the Court for some depositions --

25          THE COURT:  Well, you can always come in and ask,

1    and we'll see where we go.

2         MS. MILLER:  Just to clarify, did you also say

3    that the defendants are letting us know who they're putting

4    declarations in, in opposition, so we can depose --

5         THE COURT:  Well, if they don't let you know in

6    advance, I'll stay your reply until after you get their

7    depositions, but I would hope they would tell you in

8    advance.

9         MR. VON LOWENFELDT:  I mean, it's going to depend

10   on the time frame we set.  If they really are filing in a

11   couple of days here, we're going to want a long period of

12   time for our opposition, and I'd imagine we can build enough

13   time for them to depose our people before we file that

14   opposition, so that the reply can be --

15        THE COURT:  Yeah.

16        MR. VON LOWENFELDT:  But whatever they want for

17   the reply.  I don't want to jam anyone up on their replies.

18        THE COURT:  So let's do the motion schedule last.

19   Let's talk about the ESI for a minute.  Why wouldn't the ESI

20   -- well, let me withdraw that.  We're agreed that the ESI

21   for the people who are answering the questionnaires is

22   appropriate.

23        MR. VON LOWENFELDT:  (Ui) for them, yes.

24        THE COURT:  Okay.  The plaintiffs, I think, are

25   asking for two additional categories of information.

1    They're asking for e-mails from -- they're asking from e-

2    mails from certain supervisor/managers and they're also

3    asking for data other than e-mails, which is sort of

4    interesting.

5             MR. VON LOWENFELDT:  I don't believe we have a

6    dispute with the data other than -- to the extent we have

7    things like log-on information, call list information as to

8    the named plaintiffs and I guess these other people, we'll

9    provide that.  I was surprised to see that in a letter

10   because I thought we had conveyed that.  It's just been a

11   process of figuring out what it is.  But we will give them

12   that information.  The dispute is over the manager e-mails

13   that did not go to or from the agents themselves.

14            THE COURT:  Well, let's start there, because my

15   first thought was, the agents may no longer have access to

16   e-mails they receive from managers.  So you're prepared to

17   search the managers' boxes for e-mails with the agents.

18            MR. VON LOWENFELDT:  I don't know why that

19   wouldn't be in the agents' e-mail box, which we still have.

20            THE COURT:  Oh, you still have -- this is e-mail

21   boxes that you still have --

22            MR. VON LOWENFELDT:  Yes.

23            THE COURT:  -- that nothing has been deleted from,

24   or if it's been deleted, it's been restored.

25            MR. VON LOWENFELDT:  I can't speak to what the

1    agents were doing in terms of their own personal e-mail

2    retention but, otherwise, it should be there.  So if the

3    manager sent -- if Mr. Kennedy received an e-mail from his

4    manager --

5         THE COURT:  What about management e-mails that are

6    -- of which the agents are a subject?

7         MR. VON LOWENFELDT:  I guess our position --

8         THE COURT:  Balled out Jim today because he didn't

9    show up at 10:00, we'll see if he improves.

10        MR. VON LOWENFELDT:  I guess our position on that

11   is that it's a need in a haystack search, which really at

12   the end of the day, no one or a hundred e-mails is going to

13   tell us --

14        THE COURT:  Why can't you put in the surnames of

15   the agents to find out?  Why is that needle in a haystack?

16   We're doing word searches, right?  I mean, if there's a

17   Smith or a Jones in there and you've got 80 of them working

18   for AXA, we'll take that person out.  But if name is von

19   Lowenfeldt, how many hits are you going to get?

20        MR. VON LOWENFELDT:  About six.  But, your Honor,

21   there are e-mails that go out to all the agents all the

22   time.  All those are going to get swept up, even though

23   they're probably already in the e-mail box.  My point is not

24   so much that it's hard to find their name in the e-mail.  My

25   point is that 99.99% of those e-mails will be totally

1    irrelevant to the facts in dispute in this case.

2           What we were proposing with respect to this was

3    not that they not get it.  What are proposal was -- we'll

4    give you what the agents got and then if you can find e-

5    mails in there that you think are important to your case and

6    that actually justify the expense of going forward, show us

7    and we'll talk about it and if we can't agree, then we'll

8    come to the Court and figure out what to do next.

9           But let's -- rather than reflexively assuming that

10   the manager e-mail about them will somehow be relevant to

11   what is fundamentally an outside salesperson question for

12   the employees -- right?  An e-mail is not going to -- no one

13   e-mail can possibly tell us what they're doing at any given

14   time.  We think they should have to have some more of a

15   showing, based on an actual e-mail itself, to justify the

16   enormous -- millions of e-mails that have to be gone

17   through, searching names --

18          And you know, the proposal they sent us is not

19   just names.  It's got a lot of common terms in it that would

20   be in thousands and thousands of e-mail.  It's not that we

21   don't want to give them the discovery.  It's expensive, it

22   take a long time, and we would like to see some bang for the

23   buck before we go down that road, unless of course they're

24   going to pay for the whole thing, which I know that they

25   don't want to.

1          THE COURT:  But there are different ways of

2     testing bang for the buck, like finding a finite time

3     period, three or four of the managers, and run them with

4     respect to ten of the agents for six months, and see what we

5     get that way.

6          MR. VON LOWENFELDT:  I'm happy to meet and confer

7     with them on a more narrow -- actually, Adrian.  I'll be

8     happy to meet and confer with them on technical stuff.

9          MR. AMBINDER:  Yeah, okay.

10         MR. VON LOWENFELDT:  It's his job.  But I think

11    that if we are talking about -- our idea was sample, decide

12    whether a larger search makes sense.  I think if the Court

13    thinks that's a sensible approach, we can certainly discuss

14    what a useful sample is, a meaningful sample.

15         We're not trying to deprive them of any

16    information or, frankly, us, because I think it's more

17    likely the manager says, I haven't seen Mr. Kyle in three

18    weeks, wonder if he's ever coming back to work.  It seems

19    highly likely to me we're going to find that e-mail and not

20    an e-mail that helps them.  So it's not as though I'm not

21    also interested in this.  It's just it's not free or

22    immediate.

23         MR. AMBINDER:  (Ui) absolutely represent that they

24    did not work for us, especially pre-employment, they were

25    just studying for a test, then we'd better back it up.  And

1    we think there's going to be a lot out there showing that

2    these people were working.  I think you're going to --

3              THE COURT:  That they themselves weren't party to.

4              MS. MILLER:  If I may, I'm sorry.

5              MR. AMBINDER:  Yeah.

6              MS. MILLER:  One of the factors that is

7    significant with the ESI is that in the pre-employment

8    period, they didn't all have that.  So sometimes there were

9    computers that they used that were -- there were sort of

10   stations.  So not everyone had their own computer all the

11   time.

12             There were oftentimes people using the same

13   computer while they -- you know, before they had the later

14   period.  So a lot of these -- an individual might not have

15   everything their own but there may be e-mails going back and

16   forth between managers saying, Bob didn't come to class

17   today or Bob didn't call as many people as necessary today,

18   but Bob doesn't have an e-mail account.

19             THE COURT:  So you're with me on limiting the

20   search terms to the names of the agents.

21             MR. AMBINDER:  It has to be, because if they're

22   saying that these individuals never made calls and never had

23   anything to do with sales, all we need is an e-mail that

24   shows that Joe Intern asked Sam the Salesperson to help him

25   out with a deal.  All of a sudden, all their representations

1   on the record go out the window.  We can now show that they

2   did do work.

3          THE COURT:  So you're agreeing with me.  Good.

4          MS. MILLER:  Your Honor, I'm sorry, if I may.  I

5   think at the minimum, definitely the names are the key

6   terms.

7          THE COURT:  Right.

8          MS. MILLER:  I think there's a few others that

9   might apply to -- we can try to work on these.  We have not

10  actually sat and gone through the list of search terms and

11  how many hits they might garner.  But there are certain

12  terms, such as maybe -- well, we can try to work on this.

13  There are certain ones that might be very relevant to

14  requirements.

15         THE COURT:  I'm only going to order the names and

16  I'm going to direct that you confer on a test time period,

17  provided that by doing a test, the defendants are not going

18  to come back with the argument that says it's more

19  expensive, we should have done it all at the same time.

20         MR. VON LOWENFELDT:  The other thing that I just

21  heard is that they're focused on the pre-contract period,

22  which is a shorter time period than the three years before

23  they're employed.

24         MS. MILLER:  Just as a example.

25         MR. VON LOWENFELDT:  But I think that e-mail

1  searches about the pre-contract period to see what they were

2  doing -- and now I heard an explanation.  In the pre-

3  contract period, they're talking about work and we say

4  they're not working.  I get that.  But in the post-contract

5  period, if they're talking about work, so what?  They're

6  employees.  We know they're working.

7          So I think now, we're talking about a much

8  narrower time frame to sample from, and even if we did the

9  whole time frame eventually based on the sample, the pre-

10 contract time frame is short compared to the employee time

11 frame, and they're absolutely right.  The pre-contract

12 people didn't have AXA e-mail before they were licensed.

13 Mr. Marcus, for example, has no AXA e-mail.  He was not

14 working.  So I understand the different need there.

15         So earlier time period, do a sample, narrow the

16 search terms.  We can work that out.

17         MR. AMBINDER:  Well, we'll try, but I'm not

18 confident we will.  But we'll certainly try, Judge.

19         MS. MILLER:  If we can try to at least get the

20 names during the entire period, because I don't think that

21 will pick up as many.  And then we can maybe try to work on

22 a shorter time period for some of the opt-in -- like the

23 named plaintiffs, I think we'd be less willing to negotiate

24 on.  But perhaps for the opt-ins, we can then work on more

25 of a finite time period.

1          THE COURT:  Okay, all right.  We'll set a schedule

2     for -- somebody is keeping a list of everything that has to

3     be done, right?  So we'll set a schedule when we're done,

4     although I'm not sure how much more there is.

5          I think the only things that are left from the

6     letters are coming up with a briefing schedule and dealing

7     with late filed consents.  Am I missing issues?

8          MR. AMBINDER:  I think that's it.

9          MR. SAWYER:  Your Honor, may I clarify something?

10          THE COURT:  Clarification would be welcome.

11          MR. SAWYER:  I understand that you're going to

12     order that we run the names of the named plaintiffs on

13     managers e-mails, all the custodians that they've asked for.

14     But we're also -- we've been ordered to confer as to the

15     time period.  I didn't understand your order to mean that we

16     are now ordered to run those names on those custodians for

17     the entire time period those period those people were

18     affiliated with AXA.

19          THE COURT:  I thought for the named plaintiffs,

20     there was not a dispute about running it for the entire time

21     period.  Am I missing something?

22          MS. MILLER:  That's what I thought.

23          MR. VON LOWENFELDT:  Yes.  For the named

24     plaintiffs, their e-mail boxes, to the extent they have

25     them, we're going to give them.

```
 1              MR. SAWYER:  Right.

 2              MR. VON LOWENFELDT:  So in their e-mail box.  But

 3    manager e-mail that has their name in it, I guess it depends

 4    on what you mean by in the e-mail.  In the subject of the e-

 5    mail?

 6              MS. MILLER:  Anywhere.

 7              MR. AMBINDER:  Anywhere.

 8              THE COURT:  Or in the body.

 9              MS. MILLER:  These people only worked -- we're

10    only talking about a three-year --

11              MR. VON LOWENFELDT:  That's what I mean, the body.

12    If you're talking about the addresses, then any group e-mail

13    that went to everybody is going to get pulled by that

14    search.

15              THE COURT:  Isn't there a way to create a search

16    algorithm that says, this guy's name but not as part of the

17    entire group of associates?

18              MS. MILLER:  Well, your Honor, if the name is in

19    with a group of other people, that e-mail would have been

20    received by that person, so it would already be being

21    produced by them, because that would have been an e-mail

22    that they would have received.

23              THE COURT:  Unless they're in the pre-employment

24    period and didn't have that --

25              MS. MILLER:  Right.
```

1          THE COURT:  Were there mass e-mails to the folks

2    who were in the pre-employment period?

3          MS. MILLER:  Then they wouldn't have received the

4    e-mail if they didn't have an e-mail address.

5          THE COURT:  Right.  That's my point.  So then it

6    should be discovered.

7          MR. AMBINDER:  Well, yeah.  I mean, to us, it goes

8    to those elements of 23.  If everybody had to work on

9    Saturday and you see there are 150 names on that e-mail and

10   they all have to work on Saturday post-employment, I'm going

11   to use that in my motion.

12         MR. VON LOWENFELDT:  I think what's important,

13   your Honor, is that if we can (ui) coming out of that e-mail

14   search.

15         THE COURT:  Well, let's do this:  With the named

16   plaintiffs, let's do their entire pre-employment period.

17   And then at least after they're employed, to the extent they

18   are, they will have their own e-mail boxes.

19         MS. MILLER:  Yes.

20         THE COURT:  Okay?

21         MS. MILLER:  Could we also request the managers,

22   just for the three named plaintiffs, when their name is

23   mentioned in their post-employment --

24         THE COURT:  Well, that's what we were just talking

25   about.  How long is their post-employment period?

1       MS. MILLER:  One individual I believe is two or
2  three years, the longest.
3       THE COURT:  So why don't we take a six-month
4  snapshot, and if you find anything relevant in there, they
5  will expand it, as long as they don't come back and argue to
6  us it's more expensive to slice it up that way.
7       MS. MILLER:  So the entire pre-employment period
8  and then a six-month post-employment period.
9       THE COURT:  Six-month, right.  And then you'll
10 work something -- I mean, look, your technically
11 sophisticated partner here, Mr. Sawyer -- I don't know what
12 we're really talking about here, whether if there are
13 certain time periods where there are backup tapes that have
14 to be restored at great expense, whether there are different
15 software programs that are more or less amenable to search
16 protocols at different time frames.  But just be open and
17 candid with the plaintiffs about what the problems are, and
18 I suspect they will work with you.
19       Again, though, if we're going to limit time frames
20 ultimately, I would expect a stipulation from the
21 defendants, if the plaintiffs seek it, that the e-mails that
22 were produced for this time period are representative of the
23 frequency, nature and scope of e-mails that would have been
24 uncovered if the entire time period were searched.  If you
25 won't agree to that, then it suggests that I have to give

1    them the entire time period.

2           (Attorney microphone has stopped working.)

3           THE COURT:  Well, when was the settlement?

4           MR. AMBINDER:  2008.

5           THE COURT:  And what's the three-year period we're

6    looking at?

7           MR. AMBINDER:  2008 to 2011.

8           THE COURT:  That can't be right.  We're looking at

9    years 4, 5, 6 for class certification, right?

10          MR. AMBINDER:  2009, I'm sorry.

11          THE COURT:  2008, 2009?

12          MR. AMBINDER:  (Ui).

13          MR. VON LOWENFELDT:  (Ui).

14          THE COURT:  But haven't you had the opportunity to

15   serve interrogatories and document demands about whether

16   there were any policy changes during the relevant time

17   periods?

18          MR. AMBINDER:  Pre-class certification (ui).

19          THE COURT:  Well, I said interrogatories or

20   document demands.  But clearly, they're going to be putting

21   in managers' affidavits.  If you want to take discovery on

22   that and make expanded discovery demands based upon the

23   answers you receive, I don't really have a problem with

24   that.  But you're the ones -- right now, the topic that

25   we've been talking about is your demand for e-mails.  If

1    you're saying that the e-mails are going to be irrelevant

2    and you don't want them because they may have changed

3    their --

4              MR. AMBINDER:  (Ui).

5              THE COURT:  Yeah.

6              MR. AMBINDER:  Of course I do.  But --

7              THE COURT:  You're wondering about sampling a

8    limited time period.

9              MR. AMBINDER:  (Ui) 23 for a three-year period.

10             THE COURT:  23 for a three-year --

11             MR. AMBINDER:  If we're only going --

12             THE COURT:  Are you talking about Rule 23 or 23

13   people?  I'm lost right now.

14             MR. AMBINDER:  The Rule 23 motion --

15             THE COURT:  Yeah.

16             MR. AMBINDER:  -- involves people who worked

17   essentially over the last four years, three and a half, four

18   years.  (Ui) five or six years.  Nobody (ui).

19             THE COURT:  Whose e-mail are we looking at here?

20   I thought we were looking at the named representatives of

21   the putative class, who I presume were in the pre-employment

22   and post-employment category during years 4, 5, 6.  Am I

23   wrong?

24             MR. AMBINDER:  I don't know.  (Ui) sample people.

25             THE COURT:  Ah.

1              MR. AMBINDER:  Aha!  Now you know what I'm talking

2    about.  If you want to do a sampling, it's going to be a

3    sampling (ui) and that's everybody.  That's why in my

4    letter, I talked about how this can get stupid after a

5    while, because not one --

6              THE COURT:  Well, let's do their e-mail boxes and

7    see what we have.  How many of them were -- let's do their

8    e-mail boxes and run their names during the periods when

9    they were in pre-employment status.  That seems to be ample

10   with respect to those 60.

11             MS. MILLER:  40.

12             THE COURT:  40.

13             MR. AMBINDER:  40, my apologies.

14             MS. MILLER:  The only problem is, if we just run

15   their names during the pre-employment period, it will only

16   pick up -- because they don't yet have e-mail boxes, it will

17   only pick up the random communications with the third

18   parties, managers, et cetera.

19             THE COURT:  What proposal would you have other

20   than that?

21             MS. MILLER:  (Ui) from the employment period.

22             THE COURT:  I said we'll get for those 40, instead

23   of -- all right, let me start again.  For those 40, you'll

24   get their e-mail boxes, and for the pre-employment period

25   for those 40, the managers who interacted with them, their

1   e-mails will be searched for their names.

2          MS. MILLER:  Thank you, your Honor.  I apologize.

3          THE COURT:  Okay?  That's what I was trying to

4   say.  Maybe it didn't come out right.

5          MR. SAWYER:  Your Honor (ui).  Of those

6   custodians, not every -- not every one of those custodians

7   interacted with (ui).

8          THE COURT:  Right.  You're going to have to

9   decide, Mr. Sawyer, whether it's cheaper to run the entire

10  database once with all of the appropriate search terms, or

11  whether the algorithms can be worked out so that only the

12  relevant parties that knew each other searched for each

13  other's names.

14         MR. SAWYER:  Right.

15         MR. VON LOWENFELDT:  (Ui) so we don't want to do

16  Michael and John --

17         THE COURT:  Of course.  They don't want it any

18  more than you do.

19         MR. AMBINDER:  Thanks for clarifying that.

20         THE COURT:  No, thanks for raising the ambiguity

21  so that I had the opportunity to do it.

22         So now we're left with late opt-ins and briefing

23  schedules, right?

24         MS. MILLER:  (Ui) opt-in discovery (ui).

25         MR. AMBINDER:  (Ui).

1          MS. MILLER:  They requested to serve the

2     interrogatories on all 700 people (ui).

3          THE COURT:  If we're only going to do the Rule 23

4     motion first, then they clearly don't need that now.  I

5     mean, if you want to invite a -- if the plaintiffs want the

6     FLSA discovery to go forward to the point of decertification

7     motion practice and get that rolling while the class is

8     happening, I'm not averse to that.

9          MS. MILLER:  (Ui) just address (ui).

10         THE COURT:  Hopefully, we'll learn enough from

11    this process that we'll be better educated when we confront

12    the next one.

13         MR. AMBINDER:  The late opt-ins.

14         THE COURT:  Late opt-ins.  I mean, I thought the

15    defendants' letter was pretty reasonable.  I don't know if

16    you had a chance to think about it.  They said, let's see

17    what the reasons are.  Let's see whether the post-marking

18    issue gets rid of some of it and let's see if the others

19    have some kind of justification.  What's your reaction to

20    that?

21         MR. AMBINDER:  That's fine.

22         THE COURT:  Okay.

23         MR. AMBINDER:  (Ui).

24         MR. VON LOWENFELDT:  To be clear, I wasn't

25    suggesting (ui).

1           THE COURT:  Oh, okay, that's fine.  I'll share an

2      anecdote with you.  I had a really -- do any of you have a

3      train to catch?  I don't want to keep you folks here.

4           MR. VON LOWENFELDT:  I have a train to catch, your

5      Honor, but (ui).

6           THE COURT:  Sorry about that.

7           MR. VON LOWENFELDT:  I would ask if it's possible

8      (ui).

9           THE COURT:  If you remind me, it's definitely

10     possible.

11          MR. VON LOWENFELDT:  (Ui) late afternoon (ui).

12          THE COURT:  Of course not.  I would hope I don't

13     give off that vibe.

14          But I had an FLSA case settled with a blow (ph)

15     provision, right?  And there was a deadline for the

16     defendant to invoke the blow provision right.  Missed it by

17     two days.  He argued, ultimately to the point of persuading

18     me, we let people opt in late all the time under 216(b).

19     How can you prevent me, absent some showing of prejudice,

20     from opting out 48 hours later than I should have?  It was

21     law office error.  It wasn't the client being manipulative.

22          MR. AMBINDER:  (Ui).

23          THE COURT:  So I would expect the same -- I don't

24     want to hear about a guy who got it out a day or two late

25     because he calendared it and he got busy that day and he got

1    up the next day.  But there does have to be -- after some

2    period of leeway, whether it's two weeks or thirty days,

3    there has to be an end point, and I'm sure you'll work

4    together and find it, okay?

5              MR. AMBINDER:  Thank you.

6              THE COURT:  Briefing schedule.

7              MR. VON LOWENFELDT:  May I suggest, your Honor

8    (ui).  (Ui) but I think we're months away from (ui)

9    opposition (ui).

10             THE COURT:  Well, I want the discovery to move

11   along.  I mean, we don't have a lot of discovery to do if

12   it's in paper, right?  We can randomly generate the 20 and

13   identify the other two groups of 10 within a week.  We can

14   narrow down the questionnaire in a couple of weeks and get

15   it in the mail to those people.  We can give them thirty

16   days to fill it out and send it back.  So we're only sixty

17   days down the road.

18             The ESI search and privilege review, I mean, I

19   don't expect there's going to be a lot of privilege --

20             MR. VON LOWENFELDT:  That can take some time (ui).

21   I hate to put them in a position of putting them on a

22   schedule that's just not (ui).

23             THE COURT:  Well, you know, maybe the e-mail can

24   be done on a rolling basis.  In other words, we talked about

25   -- well, let me explain what I'm thinking when I say that.

1   We talked about complete e-mail boxes of certain plaintiffs.

2   Those should be easy to dump and deliver.

3           MR. VON LOWENFELDT:  (Ui).

4           THE COURT:  They weren't even employees.  They

5   weren't subject to the attorney/client privilege by your

6   position, right?

7           MR. VON LOWENFELDT:  (Ui).

8           THE COURT:  So you can turn over the pre-

9   employment period without any privilege review because they

10  couldn't have a privilege if they weren't an employee,

11  right?

12          MR. VON LOWENFELDT:  For most of that period, they

13  don't have e-mail boxes.

14          THE COURT:  Ah.

15          MR. VON LOWENFELDT:  Like Mr. Marcus (ui).  It

16  would only --

17          THE COURT:  Touché.  I thought I had you but

18  touché, all right.

19          MR. VON LOWENFELDT:  I'm not resisting it.  I'm

20  just saying I don't think this is (ui).

21          THE COURT:  Let me rephrase it then.  The ESI

22  people's schedule should not impede prompt delivery where

23  complete e-mail boxes are forthcoming.  That should be an

24  easy step.  So the privilege review of that aspect should be

25  able to start quickly, because we're not screening the e-

1    mails or running bouillon (ph) searches because they're the

2    plaintiffs' e-mails.

3            With respect to managers' e-mails, I understand

4    that that's a more sophisticated, delicate analysis, and

5    maybe that comes in a second wave.  But that can be done

6    while we're waiting, hopefully, for the questionnaire

7    responses, and we really shouldn't need thirty days to work

8    out a schedule for these issues and then first start

9    implementing.  We should really -- we're talking about maybe

10   sixty days of work, except for the managers' e-mails,

11   potentially.

12           So let's have that case management conference in

13   two weeks or case management status letter in two weeks,

14   that tells me whether you've worked it all out and now have

15   an agreement.  Obviously, before they put in their

16   opposition, they've got to get the questionnaires out and

17   get responses to them.

18           And they've got to depose the named plaintiffs,

19   the class reps.  Hopefully, you'll be able to find a date by

20   which you can identify -- I say the defendants -- the

21   declarents that they will be using, or at least the majority

22   of them, and we can schedule those depositions within a

23   short period as well.

24           MR. VON LOWENFELDT:  (Ui).

25           THE COURT:  Was that a moment of heated zealous

1    advocacy, Mr. Ambinder?

2              MR. AMBINDER:  (Ui).

3              THE COURT:  Yeah.

4              MR. AMBINDER:  (Ui).

5              MR. VON LOWENFELDT:  (Ui).

6              THE COURT:  Right.  For you, it's the discovery

7    driving the motion until you get within a month or so of

8    completing it.

9              MR. AMBINDER:  We'll take it up.

10             THE COURT:  So either way.  You can either hold

11   off on filing -- the only problem is, if you hold off on

12   filing and it raises something that we haven't discussed,

13   once you do, they will be back in here looking for a longer

14   discovery schedule.  If you file soon and then two months

15   later, they come in and they try to move the schedule, that

16   creates the appearance of a tactical approach rather than a

17   merits-based one.

18             I didn't mean to deprive you of that remark, if

19   you'd like me to repeat it.

20             MR. VON LOWENFELDT:  I hear you.  I'm sorry (ui).

21             THE COURT:  And I'm not complaining about the

22   interruption.  I just don't want you to miss anything.

23             All right, I'll get a letter from you in two

24   weeks, ironing out what we talked about tonight into some

25   kind of a formal structure.  It's been a great privilege to

1    spend my afternoon with all of you.

2              MR. VON LOWENFELDT:  Thank you, your Honor.

3              MS. MILLER:  Thank you.

4              THE COURT:  Bye.

5                        * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18      I certify that the foregoing is a correct transcript

19  from the electronic sound recording of the proceedings in

20  the above-entitled matter.

21

22

23

24

25  ELIZABETH BARRON                    March 22, 2013