UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
BENNET MARCUS, STEVE KENNEDY,
and ISAAC KEIL, individually and on behalf
of other persons similarly situated who were
employed by AXA ADVISORS, LLC, AXA
FINANCIAL SERVICES, LLC, and AXA
NETWORK, LLC and/or any other entities
affiliated with or controlled by AXA
ADVISORS, LLC and AXA NETWORK,
LLC,                                                             **MEMORANDUM & OPINION**

               Plaintiffs,                    Case No. 11–CV–2339 (PKC)

      - against -

AXA ADVISORS, LLC, AXA FINANCIAL
SERVICES, LLC, and AXA NETWORK,
LLC and/or any other entities affiliated with or
controlled by AXA ADVISORS, LLC, AXA
FINANCIAL SERVICES, LLC, and AXA
NETWORK, LLC,

               Defendants.
------------------------------------------------------X

PAMELA K. CHEN, United States District Judge:

Plaintiffs move this Court for certification of a liability-only class pursuant to Federal Rule of Civil Procedure 23 ("FRCP 23"), asserting that Defendants AXA Advisors, LLC, AXA Financial Services, LLC, and AXA Network, LLC and/or any other related companies (collectively, "AXA") violated the New York Labor Law's minimum wage and overtime provisions by mis-classifying certain groups of individuals as independent contractors and outside sales agents. Plaintiffs contend that AXA relied on these mis-classifications to wrongfully circumvent New York's minimum wage and overtime laws. For the reasons set forth below, Plaintiffs' motion for class certification is denied.

1

## I. PROCEDURAL HISTORY

Plaintiffs initiated this action on May 13, 2011, asserting that AXA violated the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") by failing to pay pre-contract associates and employee-agents minimum wage and overtime. (Dkt. 1). On March 12, 2012, Plaintiffs moved for conditional certification as a collective action under Section 216(b) of the FLSA. (Dkt. 21). Chief Magistrate Judge Steven M. Gold heard oral argument on Plaintiffs' motion for conditional certification on May 30, 2012, and granted the motion orally. (Dkt. 38).[1]

On August 1, 2012, Plaintiffs filed an amended complaint. (Dkt. 48). On March 19, 2013, Chief Magistrate Judge Gold granted Plaintiffs leave to file a motion for class certification under FRCP 23. (Dkt. 96).[2]

On April 5, 2013, the parties submitted a questionnaire to be sent to 40 New York opt-in plaintiffs. (Dkt. 99). The parties proposed sending the questionnaire to 10 individuals chosen by AXA, 10 chosen by Plaintiffs' counsel, and the remainder chosen at random. (*Id*. at ECF 1–2). Chief Magistrate Judge Gold approved the parties' proposed procedure and schedule, including the questionnaire, on April 8, 2013. (Order dated 4/8/2013).

On April 21, 2014, Plaintiffs filed their motion for Rule 23 class certification (Dkt. 123) and Defendants filed their opposition (Dkt. 126). On February 20, 2015, the Court heard oral argument on Plaintiffs' motion.

---

[1] During oral argument on the present motion on February 20, 2015, Defendants advised the Court that they intend to file a motion for decertification of the collective action.

[2] This case was previously before the Honorable Sterling Johnson. On April 19, 2013, the case was transferred to me.

## II.    FACTUAL BACKGROUND

AXA is a licensed broker-dealer of financial products.  AXA agents sell retirement investments, life insurance, annuities, and other financial instruments.  (Dkt. 124, Plaintiffs' Memorandum of Law in Support of Motion for Class Certification ("Pl. Memo") at ECF 9; Dkt. 126, Defendants' Memorandum in Opposition ("Def. Opp.") at ECF 11).[3]  AXA has six branch offices in New York State: New York City, Long Island, Albany, Rochester, Buffalo, and Syracuse.  (Def. Opp. at ECF 11).  Five of the branch offices have satellite offices: Fort Lee, New Jersey (associated with New York City); Brooklyn (associated with Long Island); Poughkeepsie (associated with Albany); Vestal (associated with Syracuse); and Erie, Pennsylvania (associated with Buffalo).  (*Id.*)  AXA's branch offices are subdivided into districts, which are run by District Managers.  (Def. Opp. at ECF 12).  AXA contends that each district is essentially run as its own business unit, with District Managers taking responsibility for managing the sales force in their districts.  (*Id.*)  Plaintiffs, however, contend that the policies across offices in New York State were largely uniform.  (Pl. Memo at ECF 15).

Plaintiffs propose a class comprised of two general categories of individuals affiliated with AXA in New York State: (1) pre-contract associates who signed a 12th edition or 20th edition agreement with AXA, and (2) employee sales-agents who signed a 20th edition contract with AXA.

### A.    Pre-Contract Associates

During the time period relevant to this suit, individuals seeking to join AXA as sales agents first affiliated with AXA as "pre-contract associates."  At the start of the pre-contract period, individuals signed two "pre-employment agreements" with AXA.  (Dkt. 125–1 (pre-

---

[3]    "ECF" refers to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

employment agreement with AXA Advisors LLC); Dkt. 125–2 (pre-employment agreement with AXA Network LLC). Both agreements stated that the pre-contract associate would be treated as an independent contractor and was not entering into an employment relationship with AXA. (Dkt. 125–1 at ECF 1; Dkt. 125–2 at ECF 2). Pre-contract associates could hold other employment during their pre-employment period, unless their other position presented a conflict of interest with AXA. (Def. Opp. at ECF 14; Dkt. 125–2 at ECF 1; *see also* Dkt. 125–7 at ECF 97 (Chiang deposition testimony that she held a full-time job during pre-contract period)).

The pre-contract associates at issue in this action were on track to join either the 20th edition group at AXA or the 12th edition group. (Pl. Memo at ECF 9). The 20th edition group sold a broad array of financial products, while the 12th edition group, also known as the Retirements Benefits Group ("RBG"), sold retirement plans for public school system employees. (*See* Dkt. 127, Declaration of AXA Mangers ("Mgr. Decl."), Ex. O ¶¶ 8–10).

The pre-employment agreements were uniform among offices and did not change substantially during the time period relevant to this suit. (Dkt. 132, Plaintiffs' Reply Memorandum ("Pl. Reply") at ECF 11). After signing the agreements, a pre-contract associate who had yet to obtain the necessary licenses to work as an agent would begin studying for the licensing exams. The licenses required for the positions at issue in this lawsuit are (1) a Life and Health Insurances license from the New York State Division of Financial Services; (2) a Series 7 license from the Financial Industry Regulatory Authority ("FINRA"); and (3) either a Series 63 or Series 66 FINRA license. (Pl. Memo at ECF 9; Def. Opp. at ECF 15). Under the applicable FINRA regulations, an individual can only obtain the two FINRA licenses at issue by first affiliating with a licensed broker-dealer like AXA. (Def. Opp. at ECF 13 n.7). AXA did not

allow unlicensed pre-contract associates to make any sales, and so unlicensed pre-contract associates were not paid by AXA during the "study" phase of their pre-employment period.[4]

After obtaining the necessary licenses, the pre-contract associate entered the next phase of pre-employment: selling a certain number of "production credits"[5] before the end of the six-month pre-contract period. (Def. Opp. at ECF 14). Pre-contract associates making such sales were eligible to be paid by commission. (Pl. Memo at ECF 10). AXA branches varied in the required number of production credits necessary to be considered for employment, but the minimum number of required production credits was 3,000. (*See* Dkt. 125–2 at ECF 1; Dkt. 127, Declaration of AXA Mangers ("Mgr. Decl."), Ex. B ¶ 12 (3,000 production credits required for offer in Albany); Mgr. Decl., Ex. K ¶ 11 (3,000–5,000 production credits required for offer in Rochester)). Upon meeting the production credit requirement, pre-contract associates would be eligible to receive an offer of full-time employment as AXA sales agents.

Plaintiffs contend that AXA required pre-contract associates to prospect for business during the licensing phase of their pre-employment, forcing them to work for AXA's benefit though they were not eligible to receive compensation. (Pl. Memo at ECF 14). Named Plaintiff and proposed class representative Bennet Marcus, who affiliated with AXA's New York City branch in October 2010, testified that during his first month with AXA, he spent up to six hours a

---

[4]     While AXA's formal policy was to prohibit unlicensed pre-contract associates from making sales, Plaintiffs have put forth some evidence of unlicensed pre-contract associates prospecting for business by calling potential clients to set up appointments. (*See, e.g.*, Dkt. 125–5 at ECF 54 (deposition testimony from Marcus stating he would call prospective clients or go on meetings)). The ultimate sale, however, would be made by an AXA employee-agent, since federal and state law prohibit unlicensed individuals from selling certain financial products. (*See, e.g.*, Dkt.125–8 at ECF 76 (deposition testimony from Keil stating that he would give his sales to somebody else to make during the period in which he had not obtained his FINRA licenses).

[5]     A production credit was earned by making a sale. Each production credit represented a dollar of sales. (*See* Mgr. Decl., Ex. B ¶ 12).

day cold-calling prospective clients. (Dkt. 125, Murphy Declaration ("Murphy Decl.") at ECF 4).[6] Proposed class member Jennifer Chiang, also in the New York City branch, testified that she was required to solicit business during the study phase. (Murphy Decl. at ECF 6–7). Other putative members of the proposed class and individuals who returned the questionnaire attest to their prospecting for business without compensation. (Dkt. 125–12 at ECF 3; Dkt. 125–13 at ECF 2; Dkt. 125–14 at ECF 2–3; Dkt. 125–15).[7] Two AXA managers, one in New York City and one in Rochester, conceded that some pre-contract associates prospected for business while studying for their exams, but maintained that such conduct was rare and the choice of the particular pre-contract associate. (Mgr. Decl. Ex. J ¶ 19 (New York City); *id.* at Ex. K ¶ 12 (Rochester)). Other AXA managers maintained that during the licensing phase, pre-contract associates did not solicit business and were not allowed to do so. (*See* Mgr. Decl., Ex. B ¶ 17 (Albany); *id.* at Ex. D ¶ 8 (Buffalo); *id.* at Ex. G ¶ 5 (Long Island); *id.* at Ex. I ¶ 13 (New York City); *id.* at Ex. N ¶ 13 (Syracuse)).

Plaintiffs also contend that AXA managers required them to be in the office during the pre-contract period for trainings, district meetings, call times, and regulatorycompliance meetings. Though some of these required meetings were specific to the pre-contract program, such as product trainings, others were for full-time employees, like district meetings, branch

---

[6]    Defendants sought to strike the Murphy Declaration as containing improper characterizations and argument as to the underlying facts. (Dkt. 130). Although the Court denied the motion at the February 20, 2015 oral argument, it has taken into consideration Defendants' objections to the statements therein. (Order dated 2/20/2015).

[7]    Named Plaintiff and proposed class representative Isaac Keil also began his affiliation with AXA as a pre-contract associate, but because he has released claims relating to his time as a pre-contract associate, Plaintiffs conceded at oral argument that he cannot represent pre-contract associates. The third Named Plaintiff in this action, Steve Kennedy, was an employee sales-agent with AXA's RBG and is not part of the proposed class. (Dkt. 97, Transcript of 3/18/2013 Hearing at ECF 12) (noting Plaintiffs do not seek class certification of RBG employee-agents).

meetings, and call sessions. (*See* Dkt. 125–9 at ECF 128–31 (deposition testimony of Rochester proposed class member Otis Leach stating that he understood all meetings and trainings to be mandatory); Dkt. 125–10 at ECF 116, 118–19 (deposition testimony of Long Island proposed class member Pia Ganguly stating that her district manager required her to attend district meetings); Dkt. 125–11 at ECF 54–55, 57–59 (deposition testimony of Buffalo proposed class member Ryan Falgiano stating that he attended trainings 3–4 times a week and was required to observe call nights on several occasions).

Defendants, however, maintain that AXA did not require pre-contract associates to attend meetings and trainings beyond those meant specifically for pre-contract associates and that they did not require pre-contract associates to be in the office. (*See* Mgr. Decl., Ex. A ¶ 10 (Albany manager stating licensed pre-contract associates only had to attend compliance sessions); *id.* at Ex. E ¶ 19 (Long Island manager stating pre-contract associates were welcome to attend meetings and call sessions but not required to do so); *id.* at Ex. G ¶ 5 (Long Island manager stating pre-contract associates are not required to attend anything); *id.* at Ex. I ¶ 13 (New York City manager stating unlicensed pre-contract associates were not invited to training sessions and that licensed pre-contract associates knew such sessions were optional); *id.* at Ex. L ¶ 10 (Rochester manager stating pre-contract associates may attend meetings, but that they were not required to do so and would not suffer any consequences if they did not attend). The pre-employment agreement specifies that the pre-contract associate "is required to attend product training courses and compliance sessions" and that other training sessions, such as those on sales techniques, are "encouraged but <u>not</u> required." (Dkt. 125–2 at ECF 1) (emphasis in original).

### B.    20th Edition Employee-Agents

Upon receiving an offer to join AXA as a full-time sales agent, the employee would sign a contract for at-will employment.  (Def. Opp. at ECF 19).  The contract consisted of two separate agreements, one with AXA Advisors LLC and the other with AXA Network LLC.  (Dkt. 125–3 (agreement with AXA Advisors LLC); Dkt. 125–4 (agreement with AXA Network LLC)).  At issue in this litigation are individuals who signed "20th edition" contracts, which meant that they would join the group selling a broad array of AXA financial products.  The 20th edition sales agent contract was uniform nationwide.  (Pl. Reply at ECF 11).

The contracts stated that compensation would be subject to applicable state and federal laws.  (Dkt. 125–3 at ECF 1; Dkt. 125–4 at ECF 1).  20th edition agents could elect to be paid solely on commission or on a salary with a reduced commission.  (Def. Opp. at ECF 19; Mgr. Decl., Ex. C).  The parties do not dispute the fact that 20th edition agents did not receive overtime compensation.  (*Id*. at ECF 10).  Plaintiffs contend that 20th edition agents regularly worked over 40 hours a week, but that they would receive less than the basic minimum wage during weeks when few or no sales were made.  (*Id*. at ECF 11).  AXA contends that its treatment of 20th edition agents as "outside sales agents," exempt from applicable minimum wage and overtime requirements, was proper.  (Def. Opp. at ECF 19–21).

20th edition agents' primary duty was to sell AXA financial products.  (Pl. Memo at ECF 17).  The parties do not dispute that 20th edition agents were also required to attend meetings, participate in call sessions, and undergo training at AXA's branch offices.  (Def. Opp. at ECF 19; Pl. Memo at ECF 11).  However, the parties differ on the extent to which 20th edition agents performed their work *in* the office.  Plaintiffs contend that 20th edition agents spent 5–6 days a week in AXA offices, only occasionally going on sales calls outside of the office.  (Pl. Memo at

8

ECF 11). Named Plaintiff Isaac Keil, who was a 20th edition agent in New York City, stated that there was never a period of time when he spent more time out of the office than in the office. (Murphy Decl. at ECF 8). Jennifer Chiang testified that she worked 12–13 hours a day, 6 days a week, with the majority of her time spent at AXA's New York City office. (Murphy Decl. at ECF 7). Proposed class member Otis Leach, a 20th edition agent in Rochester, stated that he typically worked 7:30 a.m. until 6:00 p.m. on weekdays, and Saturday mornings and Monday nights for call sessions, all in the office. (Murphy Decl. at ECF 9).

In contrast, AXA contends that aside from the "few hours where the agents were asked to be at a meeting or other required event, they structure[d] their time as they [saw] fit." (Def. Opp. at ECF 19). While AXA concedes that some 20th edition agents, like Jennifer Chiang, put in long hours at the office, it asserts that others would leave during the middle of the day, work shorter hours, or take personal time without any repercussions. (*Id*. at ECF 19–20). AXA maintains that agents varied in the amount of time they spent in and out of the office, and assert that this variation is evident not only from proposed class members' deposition testimony, but also from the questionnaire responses. (*Id*. at ECF 20–21). AXA did not keep records on how 20th edition agents spent their time or where they performed their work. (*Id*. at ECF 33; Pl. Memo at ECF 20).

The parties agree that 20th edition agents' sales meetings "could take place anywhere," including the prospective clients' homes, local restaurants, the customers' places of business, or AXA's offices. (Pl. Memo at ECF 11; Def. Opp. at ECF 21). AXA states that practices regarding sales calls varied among the offices: while most client meetings took place at the client's home in the Buffalo market, initial client meetings in New York City often occurred at the client's place of business. (*Id*. at ECF 21). Proposed class member Ryan Falgiano, however,

9

in his deposition, contended that the majority of his sales calls were conducted at AXA's Buffalo offices, based on AXA's preference to conduct sales meetings there. (Murphy Decl. at ECF 10). Proposed class member Otis Leach also stated that the majority of his sales were made in the office, though he sometimes met clients at their homes. (Murphy Decl. at ECF 9).

## III.  DISCUSSION

### A.  Plaintiffs' Proposed Class

Plaintiffs propose a class consisting of individuals currently or formerly engaged by AXA in the State of New York as: (1) pre-contract associates pursuant to a 12th edition or 20th edition agreement from May 13, 2005 to January 1, 2011; and (2) employee-agents pursuant to a 20th edition contract from May 13, 2005 to the present. (Pl. Memo at ECF 7). Plaintiffs' proposed class does not include pre-contract associates who entered into contracts under AXA's PEP[8] program after January 1, 2011, independent contractors who signed AXA's "14th edition"[9] contract, or 12th edition employee-agents, *i.e.*, those in AXA's RBG. (*Id.*).

In support of their motion, Plaintiffs have submitted: (1) deposition testimony and a selection of emails from seven proposed class members and 14 AXA managers in AXA's New York branch and satellite offices; (2) questionnaires submitted by opt-in plaintiffs; and (3) a declaration by an AXA executive submitted in opposition to Plaintiffs' 29 U.S.C. § 216(b) motion for conditional certification. (*See* Murphy Decl. and attached exhibits; Dkt. 133–1, Tesoro Declaration). In response, Defendants have submitted: (1) declarations from 15 AXA

---

[8]      The PEP program is AXA's new program for entry-level employees, and started in 2011. (Def. Opp. at ECF 13 n.6).

[9]      The 14th edition program is also known as AXA's "experienced sales force," and consists of employee sales-agents who have worked for AXA for three years pursuant to a 20th edition contract. (Murphy Decl. at ECF 3).

managers and executives in New York State; and (2) an analysis of the opt-in plaintiffs' questionnaire responses. (*See* Mgr. Decl. and attached exhibits; Dkt. 128 (summary of questionnaires)).

### B. Legal Standard for Class Certification

FRCP 23 sets forth the requirements for certifying a class. The party seeking certification must satisfy the four prerequisites of FRCP 23(a) and also show that at least one of the three criteria in FRCP 23(b) is met. *Marisol v. Guiliani*, 126 F.3d 372, 375–76 (2d Cir. 1997). The moving party must demonstrate compliance with these rules by a preponderance of the evidence. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

The prerequisites of FRCP 23(a) are numerosity, commonality, typicality and adequacy of representation. *Id*. 201–02. Thus, the party seeking certification must show that "(1) 'the class is so numerous that joinder of all members is impracticable'; (2) 'there are questions of law and fact common to the class'; (3) 'the claims or defenses of the representative parties are typical' of those of the class; and (4) 'the representative parties will fairly and adequately protect the interests of the class.'" *Roach v. T.L. Cannon Corp*., 778 F.3d 401, 405 (2d Cir. 2015) (quoting Fed. R. Civ. P. 23(a)). In determining whether the moving party has established the prerequisites of FRCP 23(a), the Court conducts a rigorous analysis of the record; such analysis will frequently "entail 'overlap with the merits of the plaintiff's underlying claims.'" *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013) (citing *Wal–Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011)). However, FRCP 23 does not grant the Court license to engage in "free-ranging merits inquiries"; merits questions are to be considered only "to the extent they are

relevant" to the FRCP 23(a) inquiry. *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) (citing *Wal-Mart*).

Upon a finding that the proposed class meets FRCP 23(a), the Court then determines whether certification is appropriate under FRCP 23(b). *Roach*, 778 F.3d at 405. Here, Plaintiffs seek certification under FRCP 23(b)(3), which provides that certification is proper "if both (1) 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and (2) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Roach*, 778 F.3d at 405 (quoting Fed. R. Civ. P. 23(b)).

## C.    Exemptions Applicable to the Proposed Class

Plaintiffs assert that their motion for class certification is premised on the common legal questions of whether AXA mis-classified pre-contract associates as independent contractors and 20th edition agents as outside salespersons. (Pl. Memo at ECF 25). As a threshold matter, the Court must determine the substantive standards of law applicable to independent contractors and outside salespersons. These standards inform the Court's consideration of whether Plaintiffs have met their burden to show that resolution of their claims is proper on a class-wide basis. *See Amgen Inc.*, 133 S. Ct. 1184 at 1194–95 (2013).

### 1.    Independent Contractor Exemption Under New York Law

Plaintiffs contend that AXA improperly classified pre-contract associates as independent contractors when, in fact, AXA exercised control over them in a manner consistent with an employment relationship. (Pl. Memo at ECF 12). In New York, to determine whether an individual is an independent contractor or employee, courts examine the degree of control exercised by the purported employer. *See Matter of O'Brien v. Spitzer*, 7 N.Y.3d 239, 242 (N.Y.

2006) ("an employee is someone who works for another subject to substantial control . . . [;] a person who works for another subject to less extensive control is an independent contractor."). The factors relevant to assessing control include "whether the worker '(1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll[,] and (5) was on a fixed schedule . . . .'" *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009) (citing *Bynog v. Cipriani Group. Inc.*, 1 N.Y.3d 193, 198 (N.Y. 2003)). These five factors, however, are not exhaustive. *Hart v. Rick's Cabaret Int'l, Inc.,* 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013) (citing cases). Courts also consider the employer's control and supervision of the putative employee. *See In re Hertz Corp.,* 2 N.Y.3d 733, 735 (N.Y. 2004) ("An employer-employee relationship exists when the evidence demonstrates that the employer exercises control over the results produced by claimant or the means used to achieve the results.").

### 2. Outside Salesperson Exemption Under Federal and New York Law

Plaintiffs also contend that AXA's 20th edition agents did not qualify as outside sales agents exempt from state and federal requirements for overtime compensation. (Pl. Memo at ECF 15–21). Plaintiffs argue that 20th edition agents' did not qualify for the exemption based on the location of sales appointments conducted outside the office and the proportion of time they worked outside the office. (*Id*. at ECF 18, 20). Specifically, the questions Plaintiffs pose as to class certification of 20th edition agents are: (1) whether AXA's failure to monitor and ensure that Plaintiffs engaged in sales activities at specific locations "away from the employer's business," as defined in 29 C.F.R. § 541.500, should deprive it of protection under the Fair Labor Standards Act's "outside sales" exemption; and (2) whether the New York Labor Law requires

that an employee spend more than 50% of his or her time away from the office to fall within the "outside sales" exemption. (Pl. Memo at ECF 18, 20).

The parties dispute the proper interpretation of the outside salesperson exemptions under both federal and state law. (*See* Def. Opp. at ECF 26). Though Plaintiffs urge the Court to defer ruling on the proper interpretation of these exemptions (Pl. Reply at ECF 6), the Court finds it unavoidable at this stage.[10] Were the Court to defer ruling on the proper interpretation of these exemptions, it could not determine whether Plaintiffs have met their burden to show that resolution of the 20th edition agents' FLSA claims may be achieved on a common basis, as required by FRCP 23(a), and that common questions predominate over individual ones, as required by FRCP 23(b). *See Comcast Corp.*, 133 S. Ct. at 1432 (recognizing that analysis of the required FRCP 23(a) elements "will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'"). Thus, the Court proceeds to interpret the outside salesperson exemptions under both federal and state law.

a)   <u>Federal Law</u>

Under federal law, outside sales employees are exempt from minimum wage and overtime requirements. 29 U.S.C. § 213(a)(1). Federal regulations define an outside salesperson as an employee whose "primary duty is making sales"[11] and who "customarily and regularly"

---

[10]    Plaintiffs cite *Bensinger v. Denbury Resources, Inc.*, 561 F. App'x 24 (2d Cir. 2014), as standing for the proposition that the Court should not rule on a dispute as to the interpretation of a federal statute at the class certification stage. (*See* Pl. Reply at ECF 6). However, in *Bensinger*, it was clear that the disputed interpretation did not affect "the power of the district court to certify the class." 561 F. App'x at 25. Here, however, the disputed interpretations of the federal and state outside sales exemptions directly bear on the FRCP 23 factors; Plaintiffs' memorandum concedes as much by basing the common legal and factual questions as to the 20th edition agents on Plaintiffs' preferred interpretation. (Pl. Memo at ECF 25–26). Thus, the Court's ruling on the applicable interpretation of the outside sales exemption is unavoidable here.

[11]    29 C.F.R. § 541.700 states that to qualify for an exemption, the employee's "primary duty" must be the performance of exempt work. Plaintiffs do not dispute that 20th edition

performs this duty "away from the employer's place of business." 29 C.F.R. § 541.500.[12] An "employer's place of business" is further defined as "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales[.]" 29 C.F.R. § 541.502. The regulations include the examples of making sales at the customer's place of business or at the customer's home if selling door-to-door. *Id.*

Plaintiffs read 29 C.F.R. § 541.502 as restricting "away from the employer's place of business" to apply *only* to sales made at the customer's place of business or home. (Pl. Memo at ECF 17). They propose to certify a class of 20th edition agents based on "AXA's admitted failure to monitor and ensure that Plaintiffs engaged in sales activities *only* at customers' homes or places of business. (*See id.* at ECF 18). In essence, Plaintiffs' theory is that 20th edition agents who conducted meetings with prospective clients at coffee shops and restaurants could

---

agents' primary duty was to make sales. Plaintiffs also do not argue that the in-office work performed by 20th edition agents failed to be "directly and closely related" to their primary duty of making sales. *See* 29 C.F.R. § 541.703 ("Work that is 'directly and closely related' to the performance of exempt work is also considered exempt work.").

[12]     The full text of 29 C.F.R. § 541.502 provides:

> An outside sales employee must be customarily and regularly engaged "away from the employer's place or places of business." The outside sales employee is an employee who makes sales at the customer's place of business or, if selling door-to-door, at the customer's home. Outside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal calls. Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property. However, an outside sales employee does not lose the exemption by displaying samples in hotel sample rooms during trips from city to city; these sample rooms should not be considered as the employer's places of business. Similarly, an outside sales employee does not lose the exemption by displaying the employer's products at a trade show. If selling actually occurs, rather than just sales promotion, trade shows of short duration (i.e., one or two weeks) should not be considered as the employer's place of business.

not be deemed as engaging in sales activities "away from the employer's place of business" under C.F.R. § 541.02.

Plaintiffs' narrow reading of 29 C.F.R. § 541.502 is not supported by its text. The regulation does not so restrict "away from the employer's place of business" to only apply to customers' homes or businesses. Indeed, the regulation itself refers to other locations where "outside sales" can occur, *i.e.*, hotel rooms and trade shows. 29 C.F.R. § 541.502. That the regulation cites these additional examples of locations where "outside sales" may occur shows that the regulation is not limited to sales made at a customer's home or place of business or that it excludes sales activity that occurs at locations not explicitly enumerated in the provision.

The few district courts that have interpreted this regulation agree. *See, e.g.*, *Wolfram v. PHH Corp.*, 12–CV–599, 2014 WL 2737990, at *5 (S.D. Ohio June 17, 2014) ("a salesperson is exempt if she performs her sales work away from a fixed site (used by the salesperson as a headquarters or for the telephonic solicitation of sales) on a greater than occasional basis."); *Hantz v. Prospect Mortgage, LLC*, 11 F. Supp. 3d 612, 620 (E.D. Va. 2014) ("Where some of those component activities take place at a fixed site and others take place outside of a fixed site, the employee is properly classified as an outside sales employee if the activities occurring outside of the office are critical to the sales process and occur on a consistent basis.") (citing *Wong v. HSBC Mortg. Corp.*, 749 F.Supp.2d 1009, 1013 (N.D. Cal. 2010)); *Tracy v. NVR, Inc.*, 599 F. Supp. 2d 359, 363 (W.D.N.Y. 2009) (rejecting a similar argument on 29 C.F.R. § 541.502). Thus, the Court rejects Plaintiffs' restrictive interpretation of 29 C.F.R. § 541.502.

b) <u>New York Law</u>

Plaintiffs alternatively propose to certify a class of 20th edition agents based on New York's exemption for outside salespersons. (Pl. Memo at ECF 18–20). New York's definition

of an "employee" excludes outside salespersons. NYLL § 651; 12 N.Y.C.R.R. § 142-2.14. Because New York's overtime provision applies only to employees, outside salespersons are not eligible for overtime. *See* 12 N.Y.C.R.R. § 142-2.14(c)(5); NYSDOL Payment of Commissions Frequently Asked Questions at 3, *available at* http://labor.ny.gov/legal/counsel/pdf/payment-of-commissions-frequently-asked-questions.pdf (last visited on Mar. 30, 2015).

In New York, an outside salesperson is "an individual who is customarily and predominantly engaged away from the premises of the employer, and not at any fixed site and location, for the purpose of: (i) making sales; (ii) selling and delivering articles or goods; or (iii) obtaining orders or contracts for service or for the use of facilities." 12 N.Y.C.R.R. § 142-2.14(c)(5). Plaintiffs point out that while federal law requires an outside salesperson to "customarily and *regularly*" perform her duty away from the employer's place of business, New York law uses the term "customarily and *predominantly*" to define the exemption. *Compare* 29 C.F.R. § 541.502 *with* 12 N.Y.C.R.R. § 142-2.14(c)(5) (emphasis added). Thus, Plaintiffs maintain that "the only question to be determined with respect to the 'outside sales' exemption under New York Labor Law is, whether it requires that an employee spend more than 50% of his or her time away from the office in order to fall within the exemption." (Pl. Memo at ECF 20).

Defendants dispute Plaintiffs' invocation of an implicit 50% threshold in the New York outside salesperson exemption. They argue that New York's "away from the office" requirement has long followed the federal definition, and that to inject a 50% threshold into New York's requirement would be a drastic and unwarranted departure from the federal requirement, in light of the precedent establishing that the FLSA's standard is not a "majority of the time test." (Def. Opp. at ECF 29–31). Defendants also argue that Plaintiffs' interpretation would draw the NYLL into further conflict with the FLSA by rejecting the FLSA's exemption of in-office work that is

"directly and closely related" to sales. (*Id.* at ECF 30 (citing 29 C.F.R. § 541.500(b)). The Court agrees with Defendants.

Courts in the Second Circuit have found that New York's overtime requirement incorporates the FLSA's exemptions, including the federal outside sales exemption. *See, e.g., Gold v. New York Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013) (citing 12 N.Y.C.R.R. § 142–2.2); *Gold v. New York Life Ins. Co.,* No. 09–CV–3210, 2011 WL 2421281, at *3 (S.D.N.Y. May 19, 2011) (stating New York's overtime regulation "is defined and applied in the same manner as under the Fair Labor Standards Act" and then using the federal definition of outside salesperson to analyze plaintiff's claim for overtime under New York law); *Gorey v. Manheim Servs. Corp.*, 788 F. Supp. 2d 200, 205 (S.D.N.Y. 2011) ("New York overtime requirements are 'subject to the exemptions' of the FLSA"). Indeed, the text of New York's overtime regulation itself supports such an interpretation; it states that "an employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and *subject to the exemptions of sections 7 and 13* of 29 U.S.C. 201 *et seq.*, the Fair Labor Standards Act of 1938, as amended[.]" 12 N.Y.C.R.R. § 142–2.2 (emphasis added). The FLSA's outside sales exemption is found in Section 13 of the Fair Labor Standards Act, *see* 29 U.S.C. 213(a)(1), so it would appear that New York does follow the FLSA.

Plaintiffs, however, argue that the second sentence of 12 N.Y.C.R.R. § 142–2.2 evinces a rejection of the FLSA exemption by requiring New York employers to pay overtime to outside salespersons exempt under federal law. (*See* Pl. Reply at ECF 9). That sentence reads: "In addition, an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as amended . . . overtime at a wage rate of one and one-half times the basic minimum hourly rate." 12 N.Y.C.R.R. § 142–2.2. While this portion of New York's overtime

18

provision, admittedly, is not the model of clarity, the Court declines to adopt Plaintiffs' reading of it. Plaintiffs' interpretation renders the regulation internally contradictory and conflicts with Circuit precedent holding that New York's overtime requirement is to be read as incorporating the FLSA's exemptions. *See, e.g.*, *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013). Plaintiffs' reading is also irreconcilable with the regulation's explicit exclusion of outside salespersons from its definition of "employee." Furthermore, Plaintiffs' interpretation contradicts their own theory of class certification: if New York law expressly requires outside salespersons to be paid overtime, Plaintiffs would not need to resort to the 50% threshold they seek to invoke in their interpretation of the outside sales exemption.[13]

Regarding the definitional argument Plaintiffs make, they have not shown that New York's use of "predominantly" in its definition of an outside salesperson unambiguously signifies a higher threshold than Congress's use of "regularly," nor do they cite any legal authority for this proposition. Plaintiffs point to dictionary definitions defining "predominantly" as "mainly; for the most part." (Pl. Memo at ECF 19 (citing Merriam-Webster and Cambridge online dictionaries). However, the same sources define "regularly" as "very often," "at the same time every day, week, month, etc.; on a regular basis" (*see* Merriam-Webster Online, http://www.merriam-webster.com/dictionary/regularly), and "done or happening frequently" (*see* Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/

---

[13]     Plaintiffs' interpretation of 12 N.Y.C.R.R. § 142–2.2 is also inconsistent with the New York State Department of Labor's own administrative guidance. While the New York State Department of Labor acknowledges that some occupations that are exempt from overtime under the federal FLSA may still be entitled to overtime under the NYLL, outside salespeople are exempt from *both* the overtime pay provisions of the NYLL and the FLSA. *See* New York State Department of Labor, "Overtime Frequently Asked Questions," *available at* http://labor.ny.gov/legal/counsel/pdf/overtime-frequently-asked-questions.pdf (last visited Mar. 30, 2015).

regular?q=regularly#regular_32).[14]  It is hard to see how a cogent argument can be made that "predominantly" is meaningfully different from "regularly."  Given this ambiguity, the Court does not find that the NYLL's use of "predominantly" trumps the NYLL's incorporation of the FLSA's outside sales exemption.

### D.    FRCP 23(a) Analysis

Having established the applicable legal standards for Plaintiffs' claims, the Court analyzes whether certification of liability-only classes for pre-contract associates and 20th edition agents is appropriate.

### 1.    Numerosity

Numerosity requires that the proposed class have so many members so as to make joinder of all members impracticable.  Fed. R. Civ. P. 23(a)(1).  Courts in the Second Circuit presume numerosity when the proposed class is at least 40 members.  *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 383 (E.D.N.Y. 2013) *aff'd sub nom. Gortat v. Capala Bros., Inc.*, 568 F. App'x 78 (2d Cir. 2014).  Here, Plaintiffs represent that the putative class contains over 1,000 members, and that 125 individuals have opted in.  (Pl. Memo at ECF 24; Dkt. 125–50).  At least 40 of these opt-in class members are pre-contract associates who went on to become 20th edition agents. (*See* Dkt. 125–50).  Defendants do not contest numerosity.  (Def. Opp. at ECF 43).  Accordingly, Plaintiffs have established numerosity as to both proposed classes.

### 2.    Commonality

To satisfy FRCP 23(a)'s commonality requirement, plaintiffs must show that the class members have "suffered the same injury" and that their claims "depend upon a common contention . . .  of such a nature that it is capable of classwide resolution."  *Sykes v. Mel S. Harris*

---

[14]    These online sources were last viewed on March 30, 2015.

*and Associates LLC*, No. 13–2742–CV, 2015 WL 525904, at *7 (2d Cir. Feb. 10, 2015) (quoting *Wal-Mart*, 131 S. Ct. at 2551). "What matters to class certification . . . is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–132 (2009)) (emphasis in original). Thus, the commonality question before the Court at the class certification stage is "whether the record evidence demonstrates a likelihood that common answers will be determined via a class action approach, or conversely, whether differences among [the proposed class members] will necessarily generate individualized, rather than common, determinations as [the] litigation moves forward." *Jacob v. Duane Reade*, 289 F.R.D. 408, 415 (S.D.N.Y. 2013), *on reconsideration in part*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, No. 13–3873–CV, 2015 WL 525697 (2d Cir. Feb. 10, 2015) (summary order). This is where Plaintiffs' certification motion founders as to both proposed classes.

a)      Commonality as to Pre-Contract Associates

Plaintiffs contend that commonality is satisfied as to pre-contract associates because they suffered a common wrong: classification as independent contractors. (Pl. Memo at ECF 24–25; Pl. Reply at ECF 14–15). This formulation of the commonality inquiry, however, overlooks *Wal-Mart*'s instruction to consider common *answers*, not simply common questions. Rather than determining whether the putative pre-contract associate class members suffered a common wrong, the question before the Court is whether AXA's control over pre-contract associates is likely to be determined on a common, not an individualized, basis. *See Jacob*, 289 F.R.D. at 415. In other words, Plaintiffs must show that there is a common answer to the question of

whether the putative pre-contract associate class members were *mis*-classified as independent contractors.

Plaintiffs argue that commonality is shown by virtue of the pre-employment contract defining pre-contract associates as independent contractors. (Pl. Reply at ECF 11). Though common to all pre-contract associates, the contract is not dispositive of commonality in and of itself. To determine whether pre-contract associates were *improperly* classified, the Court must consider the terms of the pre-employment contract *in addition to* the working conditions of pre-contract associates. In other words, the contract poses a common question but does not, on its own, provide a common answer. To satisfy their burden, Plaintiffs must show that pre-contract associates' working conditions were sufficiently similar so as to bring their alleged mis-classification as independent contractors into question.

In opposing Plaintiffs' motion, Defendants contend that the record does not support a finding of commonality as to pre-contract associates, arguing that the category of pre-contract associates actually consists of two sub-categories, unlicensed and licensed associates, and that Plaintiffs have failed to offer a common way of establishing the proper classification of either category. (Def. Opp. at ECF 37–39).

The record shows that AXA's treatment of unlicensed and licensed pre-contract associates was sufficiently different so as to warrant separate consideration by the Court. It is undisputed that unlicensed pre-contract associates had to study for their licensing examinations and could not sell AXA products without these licenses.[15] Prior to obtaining their licenses, pre-contract associates did not have AXA phone extensions, emails, or assigned cubicles. (*See, e.g.*,

---

[15]     Whether unlicensed pre-contract associates solicited business, as opposed to made sales, is a different question. As noted below, the record provides some evidence that unlicensed pre-contract associates did solicit business.

Mgr. Decl., Ex. E ¶ 15; *id.* at Ex. H ¶ 15; *id.* at Ex. K ¶ 13; Dkt. 125–7 at ECF 101–02 (New York pre-contract associate noting lack of AXA email, business card, or phone number in pre-license period)). After obtaining their licenses, pre-contract associates could sell AXA products, and then received AXA phone extensions and email addresses. (*See, e.g.*, Mgr. Decl., Ex. B ¶ 18; *id.* at Ex. C ¶ 25). Because these differences could potentially affect the Court's determination on the merits question of AXA's control over pre-contract associates, the Court adopts Defendants' bifurcation of the pre-contract category into unlicensed and licensed associates.

(1)     Unlicensed Pre-Contract Associates

The Court turns first to the unlicensed pre-contract associates. The record shows some support for Plaintiffs' contention that AXA required unlicensed pre-contract associates, while studying for their exams, to prospect for business, attend AXA meetings and trainings meant for employees, and otherwise perform their work in the office. (*See, e.g.*, Dkt. 125–7 at ECF 98 (New York City pre-contract associate deposition testimony on conducting cold-calls while studying for licensing exams); Dkt. 125–10 at ECF 115 (Long Island pre-contract associate deposition testimony on compiling lists of prospective clients during study phase); Dkt. 125–12 at ECF 3 (New York pre-contract associate questionnaire response stating that he conducted cold-calls, and met with potential clients in study phase); Dkt. 125–9 at ECF 128–31 (Leach deposition testimony that he understood meetings, call sessions and trainings to be mandatory)).

However, the manager declarations set forth by AXA, as well as deposition testimony and questionnaires of proposed class members, demonstrate that unlicensed pre-contract associates were more likely than not to study outside of the office, on their own time; that they could hold other employment; and that they were not required to solicit business before obtaining

their licenses. (*See, e.g.*, Dkt. 125–10 at ECF 109, 127 (Long Island pre-contract associate stating she did not make calls to potential clients before passing exams); Dkt. 125–11 at ECF 59 (Buffalo pre-contract associate stating he did not solicit business in pre-license period); Dkt. 125–6 at ECF 30 (White Plains pre-contract associate stating he did not go into the office every day); Dkt. 125–9 at ECF 84–88 (Rochester pre-contract associate stating he studied at home most of the time)). In addition, the record does not credibly establish that AXA had any statewide policies requiring unlicensed pre-contract associates to study in the office, solicit business, or otherwise perform work for AXA's benefit; the manager declarations make clear that office policies were set by each branch. For example, while two managers in New York and Rochester acknowledged that pre-contract associates could solicit business before obtaining all of their licenses (Mgr. Decl., Ex. J ¶ 19; *id.* at Ex. K ¶ 12), managers in Albany, Buffalo and Syracuse stated that pre-contract associates did not solicit business while they were studying. (Mgr. Decl., Ex. A ¶ 9; *id.* at Ex. B ¶ 17; *id.* at Ex. C ¶ 21; *id.* at Ex. N ¶ 13). The Buffalo branch manager's declaration is corroborated by proposed class member Ryan Falgiano's admission that he did not do any cold-calling during the study phase of his pre-contract period. (Dkt. 125–11 at ECF 59).

The mixed record on unlicensed pre-contract associates fails to demonstrate that the Court could resolve the proper classification of unlicensed pre-contract associates on a common basis. The differing practices among the offices with respect to supervision and control of pre-contract associates during the study phase of their pre-employment renders "common answers" to the question of AXA's control unlikely. *Cf. Enea v. Bloomberg. L.P.*, No. 12–CV–4656, 2014 WL 1044027, at *4 (S.D.N.Y. Mar. 17, 2014) (finding commonality where plaintiffs alleged the existence of a policy that required plaintiffs to perform uncompensated work). Therefore, the

Court finds that Plaintiffs have failed to establish commonality as to unlicensed pre-contract associates.[16] Unlicensed pre-contract associates may not participate in the class.

(2)     Licensed Pre-Contract Associates

In contrast, the record shows a greater degree of uniform treatment with respect to AXA's treatment of licensed pre-contract associates. Managers across AXA offices in New York stated that licensed pre-contract associates all engaged in business solicitation, whether by in-person meetings, visits to school districts, or cold-calling. (*See, e.g.*, Mgr. Decl., Ex. A ¶ 10; *id.* at Ex. C ¶ 21; *id.* at Ex. F ¶ 11; *id.* at Ex. G ¶ 6; *id.* at Ex. N ¶ 14). AXA provided licensed pre-contract associates with call lists, scripts, and general information on AXA's financial products. (*See, e.g.*, Murphy Decl. at ECF 12; Dkt. 125–29 at ECF 19 (deposition testimony of manager stating that licensed pre-contract associates received scripts)). Licensed pre-contract associates were subject to a common policy: in order to obtain an offer of employment from AXA, they were required to sell at least 3000 production credits.[17] (Mgr. Decl., Ex. B ¶ 12 (3,000 production credits required for offer in Albany); Mgr. Decl., Ex. K ¶ 11 (3,000–5,000 production credits required for offer in Rochester)). When licensed pre-contract associates set up appointments with prospective clients, they were accompanied by an AXA manager or more

---

[16]     To be sure, AXA's unlicensed pre-contract associate program "feels" exploitative, in that it incentivized pre-contract associates to perform work, such as cold-calling and business-prospecting, for AXA without compensation. While AXA clearly took advantage of, and benefitted from, the incentivizing aspect of its pre-contract associate program, the fact that the degree to which an unlicensed pre-contract associate responded to this incentive was an individual decision made by the associate—and was not dictated by AXA or its managers with any uniformity—makes this situation legally untenable for class action relief.

[17]     While some managers testified to the production credit requirement being above 3000 production credits, the Court does not find this difference material. *See Jacob*, 289 F.R.D. at 415 (noting that commonality does not require class members to perform identical tasks but that "largely consistent duties" will suffice).

senior AXA advisor. (*See, e.g.*, Mgr. Decl., Ex. F ¶ 11 (Long Island manager); *id.* at Ex. H ¶ 23 (New York City manager); *id.* at Ex. K ¶ 20 (Rochester manager)).

Given these common policies and practices as to licensed pre-contract associates, the Court finds that it could resolve the question of AXA's control over licensed pre-contract associates on a common basis. Plaintiffs have thus established commonality as to pre-contract licensed associates.[18]

b)    <u>Commonality as to 20th Edition Employee-Agents</u>

Given the Court's interpretation of the federal and state outside sales exemptions, as not limiting the location where outside sales could occur or requiring that an outside salesperson spend a specific percentage of time outside the employer's office, it is clear that Plaintiffs cannot demonstrate commonality of the proposed 20th edition employee-agent class. Because Plaintiffs concede that 20th edition agents' primary duty was to sell AXA financial products (Pl. Memo at ECF 17), in order to establish that AXA improperly classified 20th edition agents as outside salespeople, Plaintiffs must demonstrate that 20th edition agents did not "customarily and regularly" perform exempt work, *i.e.*, outside sales.[19] Based on the record before the Court, Plaintiffs cannot rely on any common basis to make this showing.

---

[18]    As the district court in *Jacob* recognized, "to say that there are common issues, sufficient to satisfy Rule 23(a)'s commonality requirement, is not to say that they necessarily predominate." *Jacob*, 289 F.R.D. at 415. The Court considers predominance in Section III.E below.

[19]    29 C.F.R. § 541.500's exemption of outside sales does not apply only to transactions where the outside salesperson closed a sale. The regulation also provides that "work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work." 29 C.F.R. § 541.500. Thus, telephone calls made by 20th edition employee-agents to solicit business or schedule meetings with clients or prospective clients, even if performed in AXA's offices, could be deemed "incidental to and in conjunction with" the employee-agent's outside sales activities.

The evidence adduced by both parties demonstrates that there was substantial variation with respect to employee-agents' sales work, such that determining a putative class member's eligibility for inclusion in the class would be based on a myriad of individualized determinations about the agent's sales activity. *See Anderson v. NVR, Inc.*, 300 F.R.D. 116, 119 (W.D.N.Y. 2014) ("Determining whether each plaintiff was 'customarily and regularly' engaged away from the employer's place of business in performing outside sales activities will require an individualized and fact-intensive analysis of each and every plaintiff's work experience, including their daily routines and habits, and preferred methods of procuring sales."). For one thing, AXA did not keep time records to show when 20th edition agents were conducting sales meetings or performing sales-related work. (*See* Murphy Decl. at ECF 15, 17, 19, 22, 24, 29 (testimony by AXA managers in New York City, Long Island, Syracuse, Buffalo, and Albany that AXA did not keep such records). This basic lack of records necessitates individualized determinations as any given 20th edition agent's eligibility for the outside salesperson exemption.

Plaintiffs' proposed class members also varied in the amount of time they spent outside of the office in sales meetings, thus raising individualized questions as to whether a given 20th edition agent "customarily and regularly" performed exempt work. (*See* Murphy Decl. at ECF 7 (testimony by New York City proposed class member Chiang that she spent 10 hours a week, on average, out of the office in sales meetings); *id.* at ECF 9 (testimony by Rochester proposed class member Leach that he spent 6-10 hours a week, on average, in sales meetings outside the office); *id.* at ECF 10 (testimony by Long Island proposed class member Ganguly that she "typically spent 20-22 hours per week out of the office running appointments"); Dkt. 128–6 at ECF 4 (questionnaire responses by opt-in plaintiffs showing 20th edition agents' outside time ranged

from 1-17 hours and in-office meetings ranging from 0-15).[20]  Such variation is corroborated by testimony from AXA managers stating that 20th edition agents had a great deal of flexibility and that AXA's offices took varying approaches to conducting sales meetings.  (*See* Mgr. Decl., Ex. H ¶ 27 (New York City manager stating employed advisors have a great deal of flexibility and that the New York office preferred to do initial meetings outside of the AXA office, with some follow-up meetings at AXA); Mgr. Decl., Ex. O ¶ 20 (Manager stating that 20th edition agents in the Syracuse office averaged 4–8 appointments outside the office, usually at client's offices, businesses or homes).  Nor do Plaintiffs point to any policies or practices across AXA's offices that would establish that 20th edition agents were not "customarily or regularly" performing exempt work.  *Cf. Enea*, , 2014 WL 1044027, at *4.

Plaintiffs have thus failed to meet their burden to show that that AXA's alleged improper classification of 20th edition agents may be proved on a common basis.  Having failed to establish commonality as to 20th edition agents, the Court finds that a class of 20th edition agents cannot be certified.[21]

### 3.  Typicality

"Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y.

---

[20]  The Court notes that Plaintiffs' evidence does not distinguish between in-office work "incidental to and in conjunction with the employee's own outside sales" that would be considered exempt and other work that they might have performed.  Arguably, the in-office follow-up meetings conducted by some 20th edition agents could be considered in-office work "in conjunction with the employee's own outside sales" within the meaning of 29 C.F.R. § 541.500.

[21]  Having found that the 20th edition employee-agent class fails to satisfy the commonality requirement, the Court does not address the typicality or adequacy requirements with respect to this class.

2014) (citing *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1992)). *Wal-Mart* recognized that in some contexts, commonality and typicality may merge because "both serve as guideposts determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 131 S. Ct. at 2551 n.5. A named plaintiff's claims need not be identical to those of the proposed class members; so long as the named plaintiff's claims share the same essential characteristics as that of the proposed class, typicality will be satisfied, even where there are "minor variations in the fact patterns underlying individual claims." *Glatt v. Fox Searchlight Pictures*, 293 F.R.D. 516, 537 (S.D.N.Y. 2013) (citing *Robidoux*).

Defendants argue that Plaintiffs' sole proposed class representative for the pre-contract associate class, Bennet Marcus, is not typical of the class because he only worked in New York City and had no knowledge of other AXA offices, and because he never obtained his licenses and therefore never proceeded to the second stage of the pre-contract process. (Def. Opp. at ECF 24–25). Plaintiffs counter that Marcus can still serve as the class representative for licensed pre-contract associates in spite of his failure to obtain his licenses because he prospected for business during his time at AXA, which is the principal task of licensed pre-contract associates. (Pl. Memo at ECF 28–29). Plaintiffs also point out that Marcus signed the same pre-employment agreement that other licensed pre-contract associates signed, and that Marcus claims the same injury as that of the proposed class: AXA's failure to pay minimum wage and overtime due to his classification as an independent contractor. (*Id*. at ECF 28–29). Because the Court has determined that only the licensed pre-contract associate class satisfies the commonality requirement, it considers only whether Marcus is typical of that class.

While Marcus presents a close question, the Court ultimately finds that his claims are not typical of the proposed class of licensed pre-contract associates. Marcus's affiliation with AXA lasted only three months, and he never proceeded to the licensed pre-contract phase. (Murphy Decl. at ECF 4). Though he alleges that he solicited business while at AXA, his claim rests principally on cold-calling. The record shows, however, that licensed pre-contract associates were subject to greater supervision than Marcus was, as an unlicensed pre-contract associate. In contrast to Marcus, the licensed pre-contract associates often participated in sales meetings with AXA managers, and were provided call lists and scripts by their managers. Marcus also admits his lack of familiarity with the practices of other AXA branch offices, casting doubt on whether his claims are "so interrelated" with those of licensed pre-contract associates in other offices. Thus, though he alleges that AXA directed "the same unlawful conduct" at him and licensed pre-contract associates, the Court finds that Marcus's claim does not arise from the same course of events as those of licensed pre-contract associates in AXA offices across the state of New York. *See Marisol A.*, 126 F.3d at 376. Plaintiffs, therefore, have not satisfied typicality.

### 4. Adequacy

"Adequacy of representation is evaluated in two ways: (1) by looking to the qualifications of plaintiffs' counsel; and (2) by examining the interests of the named plaintiffs." *Jackson*, 298 F.R.D. at 164. Courts consider whether the class representative is prepared to fully litigate the action and has any known conflicts with other class members. *Shayler v. Midtown Investigations, Ltd.*, No. 12–CV–4685, 2013 WL 772818, at *5 (S.D.N.Y. Feb. 27, 2015).

Defendants do not object to the qualifications of plaintiffs' counsel. (Pl. Reply at ECF 17 n.5). Based on the Plaintiffs' submission on class counsel's experience (Pl. Memo at ECF 30), the Court finds Virginia & Ambinder qualified to act as class counsel.

Defendants argue that Marcus cannot adequately represent the proposed class because his affiliation with AXA only lasted three months and was limited to the New York City office. (Def. Opp. at ECF 23). While the Court found that such characteristics defeated typicality, they do not defeat adequacy: courts in the Eastern District have found typicality based on the class representative's "basic familiarity with [the] action." *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 339 (E.D.N.Y. 2013); *see also Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 302 (E.D.N.Y. 2013) ("'attacks on the adequacy of a class representative based on the representative's ignorance' are generally disfavored." (quoting *In re Flag Telecom Holdings, Ltd. Securities Litigation,* 574 F.3d 29, 42 (2d Cir. 2009))). Though Marcus was unaware of practices in other AXA offices, a review of his deposition confirms his basic familiarity with the action and Plaintiffs' theory of recovery. Nor do Defendants otherwise identify any conflicts Marcus might have with respect to the proposed class. The Court thus finds adequacy satisfied.

### E. FRCP 23(b) Predominance

Plaintiffs seek certification under FRCP 23(b)(3), which requires the Court to find that questions of law or fact common to the class predominate over questions affecting individual members and that a class action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3). The Court finds that Plaintiffs have satisfied FRCP 23(b)(3)'s predominance requirement with respect to the class of licensed pre-contract associates.[22]

By its plain terms, FRCP 23(b)(3)'s "imposes a 'far more demanding' inquiry into the common issues which serve as the basis for class certification." *Sykes*, 2015 WL 525904 at *8

---

[22] Having found that the unlicensed pre-contract associate and the 20th edition agent classes fail to satisfy the commonality requirement, the Court does not address the predominance issue with respect to those groups.

(citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)). "Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach*, 778 F.3d at 405 (citations omitted). Thus, while FRCP 23(b)(3) "contemplates that individual questions [of proof] will be present[,]" such questions may not "predominate over the common questions affecting the class as a whole." *Sykes*, 2015 WL 525904 at *8 (citing *Messner v. Northshore Uni. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)).

Here, although Defendants have put forth evidence that AXA does not have uniform practices across its offices in New York with respect to licensed pre-contract associates—primarily in the form of manager declarations—the Court finds that the totality of the evidence is sufficient to establish the predominance of common questions relating to AXA's supervision and control of the licensed pre-contract associates. Though there are variations in the manner and degree of supervision between the different AXA offices,[23] there are sufficient practices common to these offices that could establish that these pre-contract associates were employees, rather than independent contractors, of AXA. *See Jacob*, 289 F.R.D. at 421 (rejecting contention that variations among Duane Reade stores defeated predominance where, *inter alia*, differences among stores were only marginal, and duties were consistent across the class).

---

[23]    (*See*, *e.g.*, Mgr. Decl., Ex. B ¶ 18; *id*. at Ex. E ¶ 9 (Albany and Long Island managers testifying that licensed pre-contract associates were not required to be in the office); Murphy Decl. at ECF 5–6 (licensed pre-contract associates in White Plains testified that managers required him to work in the office); Mgr. Decl., Ex. A ¶ 10 (Albany manager Ford stating licensed pre-contract associates do not cold-call); Dkt. 125–44 at ECF 18 (deposition testimony of Albany manager Woodcock stating that licensed pre-contract associates did engage in cold-calling)).

As previously discussed, the evidence shows that the licensed pre-contract associates were subject to greater supervision than unlicensed associates and that this supervision included frequent participation in sales meetings with AXA managers and receiving call lists and scripts from their managers for use in making cold-calls. (*See, e.g.*, Mgr. Decl., Ex. A ¶ 10; *id.* at Ex. C ¶ 21; *id.* at Ex. F ¶ 11; *id.* at Ex. G ¶ 6; *id.* at Ex. N ¶ 14; Murphy Decl. at ECF 12; Dkt. 125–29 at ECF 19 (deposition testimony of manager stating that licensed pre-contract associates received scripts); Dkt. 125–37 at ECF 79–81 (Buffalo manager stating that district managers supervised pre-contract associates in creating a business plan); Dkt. 125–46 at ECF 10 (Long Island manager testifying that typically all pre-contract associates' business was conducted with him); Dkt. 125–33 at ECF 48 (Syracuse manager testifying that he would follow up with pre-contract associates if they didn't attend training meetings "to make sure they're okay")). Indeed, managers across all New York State offices uniformly asserted that AXA required a licensed pre-contract associate to be accompanied by an AXA employee-agent when meeting with a client. (*See* Mgr. Decl., Ex. A ¶ 11 (Albany); *id.* at Ex. C ¶ 23 (Buffalo); *id.* at Ex. E ¶ 10 (Long Island); *id.* at Ex. H ¶ 23 (New York City); Ex. K ¶ 20 (Rochester); Ex. N ¶ 14 (Syracuse)). In addition, the licensed pre-contract associates were subject to the standard requirement of the pre-contract associate agreement to earn 3,000 production credits within a six-month period.

Thus, the Court finds that common questions predominate over individualized issues with respect to Plaintiffs' proposed class of licensed pre-contract associates. However, because the Court has found that the sole proposed class representative, Bennet Marcus, is not typical, certification must nonetheless be denied for this class.[24]

---

[24]    Having found that Plaintiffs' motion fails under FRCP 23(a) and FRCP 23(b), the Court does not decide the issue of whether certification of a liability-only class is a superior method of adjudication.

**IV.     CONCLUSION**

Based on the foregoing, the Court DENIES Plaintiffs' motion for class certification.

SO ORDERED.


                                                    */s/ Pamela K. Chen*_____
                                                    Pamela K. Chen
                                                    United States District Judge

Dated: March 31, 2015
        Brooklyn, New York